KARIN G. PAGNANELLI (SBN 174763)
  kgp@msk.com
MARC E. MAYER (SBN 190969)
  mem@msk.com
GILBERT S. LEE (SBN 267247)
  gsl@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

OMER SALIK (SBN 223056)
  omer.salik@activision.com
ACTIVISION BLIZZARD, INC.
3100 Ocean Park Blvd.
Santa Monica, California 90405
Telephone: (310) 255-2642
Facsimile: (310) 255-22152

Attorneys for Plaintiff Activision Publishing, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC., | CASE NO. CV13-05091-SS |
| Plaintiff, | **COMPLAINT FOR PATENT INFRINGEMENT** |
| v. | |
| NOVALOGIC, INC., | **Demand For Jury Trial** |
| Defendant. | |

FILED
CLERK, U.S. DISTRICT COURT

JUL 16 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

Mitchell
Silberberg &
Knupp LLP

5424330.2

1   Plaintiff Activision Publishing, Inc. ("Activision") alleges as follows:

2       1.    This is an action for patent infringement arising under the patent laws

3   of the United States, Title 35 of the United States Code.

4       2.    Plaintiff, Activision Publishing, Inc., is a corporation organized and

5   existing under the laws of the State of Delaware, having a principal place of

6   business at 3100 Ocean Park Blvd., Santa Monica, California.

7       3.    On information and belief, Defendant NovaLogic, Inc.

8   ("NovaLogic"), is a corporation organized and existing under the laws of the State

9   of California, with a principal place of business in the city of Malibu, Los Angeles

10  County, California.

11      4.    On information and belief, NovaLogic has offered and sold, and

12  continues to offer and sell, in this judicial district and elsewhere in the United

13  States, video games entitled *Delta Force; Delta Force 2; Delta Force: Land*

14  *Warrior; Delta Force: Black Hawk Down; Delta Force: Black Hawk Down: Team*

15  *Saber; Delta Force: Extreme; Delta Force: Extreme 2; Joint Operations:*

16  *Combined Arms Gold* and *Comanche 4*.

17

18  **JURISDICTION AND VENUE**

19      5.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§

20  1331 and 1338(a).

21      6.    This Court has personal jurisdiction over NovaLogic because

22  NovaLogic has committed acts of infringement in violation of 35 U.S.C. §271 and

23  has offered and provided to customers in California NovaLogic's Accused Games.

24  Additionally, NovaLogic regularly does business, solicits business, engages in

25  other persistent courses of conduct, and/or derives substantial revenue from

26  products and/or services provided in individuals in this district and has

27  purposefully established substantial, systematic, and continuous contacts with this

28  district and expects, or should reasonably expect, to be hauled into court here.

Mitchell
Silberberg &
Knupp LLP

5424330.2

1

**COMPLAINT FOR PATENT INFRINGEMENT**

7.     Venue is proper in this district pursuant to 28 U.S.C. §§1391 and 1400(b).

## FIRST CLAIM FOR RELIEF
### (Infringement Of U.S. Patent No. 6,014,145)

8.     On January 11, 2000, United States Patent No. 6,014,145 ("the '145 Patent") was duly and legally issued for an invention entitled "Navigation with optimum viewpoints in three-dimensional workspace interactive displays having three-dimensional objects with collision barriers." The '145 Patent has been assigned to Activision, and Activision is the sole and exclusive owner of the '145 Patent and holds all rights and interests in the '145 Patent. Among other things, Activision holds the sole and exclusive right to enforce the '145 Patent against alleged infringers. A copy of the '145 Patent is attached hereto as Exhibit A.

9.     NovaLogic has infringed and continues to infringe one or more claims of the '145 Patent by its manufacture, use, sale, importation, licensing and/or offer for sale of its video games entitled *Delta Force; Delta Force 2; Delta Force: Land Warrior; Delta Force: Black Hawk Down; Delta Force: Black Hawk Down: Team Saber; Delta Force: Extreme; Delta Force: Extreme 2; and Joint Operations: Combined Arms Gold*, which embody one or more claims of the '145 Patent. NovaLogic also has infringed and continues to infringe one or more claims of the '145 Patent by contributing to and actively inducing others to use, sell, import and/or offer for sale these games. NovaLogic is liable for its infringement of the '145 Patent pursuant to 35 U.S.C. §271.

10.     NovaLogic's acts of infringement have caused damage to Activision, and Activision is entitled to recover from NovaLogic the damages it has sustained as a result of NovaLogic's wrongful acts in an amount subject to proof at trial.

1     11.    NovaLogic's infringement of Activision's '145 patent will continue to

2    damage Activision, causing irreparable harm for which there is no adequate

3    remedy at law, unless enjoined by this Court.

4

5                 **SECOND CLAIM FOR RELIEF**

6        **(Infringement of U.S. Patent No. 5,883,628)**

7     12.    On March 16, 1999, United States Patent No. 5,883,628 ("the '628

8    Patent") was duly and legally issued for an invention entitled "Climability:

9    property for objects in 3-D virtual environments." The '628 Patent has been

10   assigned to Activision, and Activision is the sole and exclusive owner of the '628

11   Patent and holds all rights and interests in the '628 Patent. Among other things,

12   Activision holds the sole and exclusive right to enforce the '628 Patent against

13   alleged infringers. A copy of the '628 Patent is attached hereto as Exhibit B.

14    13.    NovaLogic has infringed and continues to infringe one or more claims

15   of the '628 Patent by its manufacture, use, sale, importation, licensing and/or offer

16   for sale of its videogames entitled *Delta Force; Delta Force 2; Delta Force: Land*

17   *Warrior; Delta Force: Black Hawk Down; Delta Force: Black Hawk Down: Team*

18   *Saber; Delta Force: Extreme; Delta Force: Extreme 2; and Joint Operations:*

19   *Combined Arms Gold*, which embody one or more claims of the '628 Patent.

20   NovaLogic also has infringed and continues to infringe one or more claims of the

21   '628 Patent by contributing to and actively inducing others to use, sell, import

22   and/or offer for sale these videogames. NovaLogic is liable for its infringement of

23   the '628 Patent pursuant to 35 U.S.C. §271.

24    14.    NovaLogic's acts of infringement have caused damage to Activision,

25   and Activision is entitled to recover from NovaLogic the damages it has sustained

26   as a result of NovaLogic's wrongful acts in an amount subject to proof at trial.

27

28

Mitchell
Silberberg &
Knupp LLP

5424330.2

**COMPLAINT FOR PATENT INFRINGEMENT**

15.     NovaLogic's infringement of Activision's '628 patent will continue to damage Activision, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

## THIRD CLAIM FOR RELIEF
### (Infringement of U.S. Patent No. RE38865)

16.     On November 1, 2005, United States Patent No. RE38865 ("the '865 Patent") was duly and legally issued for an invention entitled "System and method for optimizing computer software and hardware." The '865 Patent has been assigned to Activision, and Activision is the sole and exclusive owner of the '865 Patent and holds all rights and interests in the '865 Patent. Among other things, Activision holds the sole and exclusive right to enforce the '865 Patent against alleged infringers. A copy of the '865 Patent is attached hereto as Exhibit C.

17.     NovaLogic has infringed and continues to infringe one or more claims of the '865 Patent by its manufacture, use, sale, importation, licensing and/or offer for sale of its video games entitled *Comanche 4* and *Delta Force: Black Hawk Down*, which embody one or more claims of the '865 Patent. NovaLogic also has infringed and continues to infringe one or more claims of the '865 Patent by contributing to and actively inducing others to use, sell, import and/or offer for sale these games. NovaLogic is liable for its infringement of the '865 Patent pursuant to 35 U.S.C. §271.

18.     NovaLogic's acts of infringement have caused damage to Activision, and Activision is entitled to recover from NovaLogic the damages it has sustained as a result of NovaLogic's wrongful acts in an amount subject to proof at trial.

19.     NovaLogic's infringement of Activision's '865 patent will continue to damage Activision, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, Activision requests entry of judgment in its favor and against the NovaLogic defendants as follows;

a.      Declaring that NovaLogic has infringed U.S. Patent Nos. 6,014,145; 5,883,628; and RE38865;

b.      Awarding damages arising out of NovaLogic's infringement of U.S. Patent Nos. 6,014,145; 5,883,628; and RE38865, including prejudgment and post-judgment interest, in an amount according to proof;

c.      Permanently enjoining NovaLogic and its respective officers, agents, employees, and those acting in privity with them, from further infringement, including contributory infringement and/or inducing infringement, of U.S. Patent Nos. 6,014,145; 5,883,628; and RE38865;

d.      Awarding such other costs and further relief as the Court may deem just and proper.

DATED:  July 16, 2013

OMER SALIK
ACTIVISION BLIZZARD, INC.

KARIN G. PAGNANELLI
MARC E. MAYER
MITCHELL SILBERBERG & KNUPP LLP

By: _____
Marc E. Mayer (SBN 190969)
Attorneys for Plaintiff
Activision Publishing, Inc.

1

## JURY DEMAND

2     Activision requests a trial by jury.

3

4     DATED:  July 16, 2013

5                                    OMER SALIK
                                     ACTIVISION BLIZZARD, INC.
6
                                     KARIN G. PAGNANELLI
7                                    MARC E. MAYER
                                     MITCHELL SILBERBERG & KNUPP LLP
8

9

10    By: _____
                                     Marc E. Mayer (SBN 190969)
11                                   Attorneys for Plaintiff
                                     Activision Publishing, Inc.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

5424330.2

**COMPLAINT FOR PATENT INFRINGEMENT**

**EXHIBIT A**



US006014145A

# United States Patent [19]

## Bardon et al.

[11] **Patent Number:** 6,014,145

[45] **Date of Patent:** Jan. 11, 2000

[54] **NAVAGATION WITH OPTIMUM VIEWPOINTS IN THREE-DIMENSIONAL WORKSPACE INTERACTIVE DISPLAYS HAVING THREE-DIMENSIONAL OBJECTS WITH COLLISION BARRIERS**

[75] Inventors: **Didier Daniel Claude Bardon**, Austin; **Richard Edmond Berry; Scott Harlan Isensee**, both of Georgetown; **Shirley Lynn Martin**, Austin, all of Tex.

[73] Assignee: **International Business Machines Corporation**, Armonk, N.Y.

[21] Appl. No.: **08/888,804**

[22] Filed: **Jul. 7, 1997**

[51] Int. Cl.[7] ............................................. G06F 3/00
[52] U.S. Cl. .................................... 345/427; 345/474
[58] Field of Search ................................ 345/427, 428, 345/429, 418, 419, 420, 474

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,578,757 | 3/1986 | Stark | 364/461 |
| 5,047,916 | 9/1991 | Kondo | 364/167.01 |
| 5,056,031 | 10/1991 | Nakano et al. | 364/461 |
| 5,347,459 | 9/1994 | Greenspan et al. | 364/461 |
| 5,515,489 | 5/1996 | Yaeger | 395/152 |
| 5,528,735 | 6/1996 | Strasnick et al. | 345/427 |
| 5,548,694 | 8/1996 | Frisken Gibson | 395/124 |
| 5,561,742 | 10/1996 | Terada et al. | 395/90 |

*Primary Examiner*—Phu K. Nguyen
*Assistant Examiner*—Cliff N. Vo
*Attorney, Agent, or Firm*—Jerry Kraft; Volel Emile

[57] **ABSTRACT**

In a data processor controlled display system having three-dimensional objects laid out in a three-dimensional virtual workspace, the objects have associated there with respective collision barriers which are stored with their corresponding objects. Then during navigation via changing the users viewpoint in to the workspace, when this changing viewpoint encounters any collision barrier which is offset from its object by a selected distance D, the viewpoint stops. This distance of the barrier from the object is selected so as to stop the viewpoint at a distance sufficiently removed from its particular object so as to leave the user or viewer with a view of the workspace of sufficient scope to permit the viewer to select a different navigation path or path branch. In accordance with a further aspect of the present invention, the viewpoint is optionally provided with a similar collision barrier.

**23 Claims, 5 Drawing Sheets**



U.S. Patent

Jan. 11, 2000

Sheet 1 of 5

6,014,145



FIG. 1

**U.S. Patent**          Jan. 11, 2000          Sheet 2 of 5          **6,014,145**



FIG. 2



FIG. 3

EX. A    PG. 10

U.S. Patent          Jan. 11, 2000          Sheet 4 of 5          6,014,145



FIG. 4A

START

USING SUPERSCAPE VRT LAYOUT AND STORE VIRTUAL REALITY 3D WORKSPACE — 61

CREATE AND STORE A PLURALITY OF 3D VIRTUAL OBJECTS — 62

FOR EACE OBJECT CREATE A COLLISION BARRIER AT A PRESELECTED DISTANCE FROM OBJECT PERIPERY — 58

ST0RE COLLISION BARRIER IN ASSOCIATION WITH IT'S CORRESPONDING OBJECT — 59

PROVIDE AND STORE VIEWPOINT NAVIGATION MEANS — 60

PROVIDE AND STORE VIEWPOINT COLLISION BARRIER AT A DISTANCE FROM VIEWPOINT: TO BE OPTIONALLY ACTIVATED — 61

PROVIDE AND STORE MEANS FOR INTERACTIVELY CHANGING VIEWPOINT AND OBECT COLLISION BARRIER DISTANCES — 62

A

U.S. Patent          Jan. 11, 2000          Sheet 5 of 5          6,014,145



FIG. 4B

6,014,145

1

# NAVAGATION WITH OPTIMUM VIEWPOINTS IN THREE-DIMENSIONAL WORKSPACE INTERACTIVE DISPLAYS HAVING THREE-DIMENSIONAL OBJECTS WITH COLLISION BARRIERS

## CROSS-REFERENCE TO RELATED APPLICATION

Copending application "Climbability: A Property For Objects in 3-D Virtual Environment", J. Mullaly et al. (Attorney Docket No. AT9-97-212) relates to objects with barriers which viewpoints may climb over.

## TECHNICAL FIELD

The present invention relates to user interactive computer supported display technology and particularly to such user interactive systems and methods which are user friendly, i.e. provide even non-computer-literate users with an interface environment which is easy to use and intuitive.

## BACKGROUND OF THE INVENTION

The 1990's decade has been marked by a societal technological revolution driven by the convergence of the data processing industry with the consumer electronics industry. This advance has been even further accelerated by the extensive consumer and business involvement in the internet over the past two years. As a result of these changes, it seems as if virtually all aspects of human endeavor in the industrialized world requires human-computer interfaces. As a result of these profound changes, there is a need to make computer directed activities accessible to a substantial portion of the world's population which, up to a year or two ago, was computer-illiterate, or at best computer indifferent. In order for the vast computer supported market places to continue and be commercially productive, it will be necessary for a large segment of computer indifferent consumers to be involved in computer interfaces. Thus, the challenge of our technology is to create interfaces to computers which are as close to the real world as possible.

Industry has been working towards this challenge and there is presently a relatively high degree of realism possible in interfaces. This presents a need and an opportunity for even more realistic interaction techniques to better match the visual metaphors used and to achieve a higher level of ease of use for computer systems. We are striving towards the representation of object as photo realistic, three-dimensional (3D) models rather than as the icons and two-dimensional desktops of conventional computer technology.

Some examples of current technology for the creation of virtual three-dimensional workspace display interfaces are copending applications Ser. No. 08/813,891 filed Mar. 7, 1997, entitled "VIEWER INTERACTIVE OBJECT IN VIRTUAL THREE-DIMENSIONAL WORKSPACE" and Ser. No. 08/813,848 filed Mar. 7, 1997, entitled "VIEWER INTERACTIVE OBJECT WITH MULTIPLE SELECTABLE FACE VIEWS IN VIRTUAL THREE-DIMENSIONAL WORKSPACE", both assigned to the assignee of the present application.

A 3D virtual workspace display environment is also described in an article entitled, "RAPID CONTROLLED MOVEMENT THROUGH A VIRTUAL 3D WORKSPACE", Jock Mackinlay et al., *Computer Graphics Publication*, Vol. 24, No. 4, August 1990, pp. 171–175, as well as in its related U.S. Pat. No. 5,276,785.

It is clear that current technology in virtual three-dimensional workspaces has provided environments which

2

are user friendly, i.e. make the casual computer user feel more comfortable and at home with the interface. However, researchers in human factors have found downsides to three-dimensional virtual reality displays. Because of the many choices that the user has in wandering down various "streets and roads" or visiting a wide variety of "buildings or stores" or going through many possible "doors", the user may wander through this reality and perhaps get lost from the track or goal he is pursuing.

The present invention addresses this problem, i.e. that of helping the interactive user in three-dimensional graphic environments to stay focused and relate to the paths he is seeking to travel to in the manner he is seeking to travel to reach objects even when these objects are arranged in 3D space in what appears to be infinite configurations. The invention facilitates the user's navigation in the 3D space so that the user may easily and quickly continue on his navigational path and stick to his navigational objectives. The invention aids the navigating viewer in relating to objects which could be impediments to his continued navigation.

## SUMMARY OF THE INVENTION

It is understood that in order to navigate through three-dimensional space, view the space or relate to objects within the space, a viewpoint is determined within that space. That viewpoint is the virtual position of the viewer or person who is navigating within the three-dimensional space. The viewpoint is commonly defined by its position and its orientation or direction. For purposes of describing this invention, we will use the metaphor of a camera to understand the viewpoint. The camera's position and orientation are where it is and which way it is pointing. Let us refer to another property of a viewpoint which is "field of view"; this is effectively the resulting view from a given viewpoint. A key need of a viewer navigating through virtual three-dimensional space is to stay focused and navigate as easily as possible and thus permit this user to concentrate and focus on his planned tasks rather than the navigation itself.

The present invention provides a user aid in navigation by an arrangement which prevents the user viewpoint from colliding with objects or other three-dimensional impediments in the workspace, but more particularly stops the viewpoint short of the object or impediment at a position such that the viewpoint does not "bring the user's nose right up against the object or impediment." Rather, the viewpoint is stopped at a distance such that the user still has a view of reasonable scope from which he may select other paths or branches in his navigation. In other words, the user's field of view from the stopped viewpoint will be such that his further navigation will be facilitated. To this end, the present invention stores in association with each of a plurality of virtual three-dimensional objects, a collision barrier around the periphery of the object at a distance from the object such that any viewpoint stopped at the collision barrier will still have a reasonable field of view from which to select further navigational paths. Data defining such a collision barrier is stored in association with the data defining the respective object. Then, during the course of navigation when any viewpoint intersects such a collision barrier of a particular object the viewpoint is stopped. From the stopped viewpoint the user has the option or ability to reorient himself and select alternative paths or navigation branches.

In according to a more particular aspect of the present invention, the user of the display system is provided with means for interactively changing these collision barriers of particular objects in order to more specifically relate the

6,014,145

3

system to his selected interactive function. In systems where the interactive user has the ability to alter objects or the content of objects, it is most desirable to give such users the further ability of changing the collision barriers associated with such changed objects to better relate these two desired interactive functions. This ability to change the collision barrier interactively is particularly desirable where the object is changing dynamically. In such a case, it is likely to be desirable that collision barrier be changed dynamically in response to the dynamically changed object. For example, if the functionally interactive object is one conveying readable information, the collision barrier may be at one distance when the readable material is graphics and at another distance perhaps closer when the readable material is text.

Collision boundaries or portions of them may be interactively turned off by the user to accommodate particular changes, especially in a dynamic environment as described above. Such turned-off collision boundaries may of course be interactively turned on again to accommodate other changes.

In accordance with another aspect of the present invention, the collision barrier may also be associated with a viewpoint, i.e., the viewpoint may have a collision barrier so that when the collision barrier of the viewpoint intersects the collision barrier of an object or the periphery of an object when the object has no collision barrier, then the viewpoint stops at such an intersection. Like that of objects, the collision barrier of a viewpoint may also be changed interactively so that the viewpoint is stopped at a relatively optimum distance from the object from which navigation may be continued.

In accordance with one aspect of the present invention, the objects may have preselected collision barriers dependant upon the properties of the objects as described above, and the viewpoint may have a collision barrier, the distance of which from the viewpoint may be changed in order to fine tune the stopping position of the viewpoint at a position most desirable for further navigation even in a changing workspace.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a data processing system including a central processing unit which is capable of implementing the present invention;

FIG. 2 is a selected three-dimensional workspace filled with a variety of objects;

FIG. 3 is a diagrammatic representation of a top or planned view of the workspace of FIG. 2 with the collision barriers surrounding objects and the viewpoint being shown as dashed lines; and

FIGS. 4A and 4B are flowcharts of the process implemented by the present invention (FIG. 4A) and for navigating through the three-dimensional workspace layout (FIG. 4B).

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Before going into the details of specific embodiments, it will be helpful to understand from a more general perspective the various elements and method which may be used to implement the present invention. The present invention is implemented in three-dimensional virtual workspace. A three-dimensional workspace is a workspace that is perceived as extending in three orthogonal directions. Typically a display has a two-dimensional display surface and the

4

perception of a third dimension is effected by visual clues such as perspective lines extending toward a vanishing point. Distant objects are obscured by nearer objects. The three-dimensional effect is also provided by showing changes in objects as they move toward or away from the viewer. Perspective shading of objects and a variety of shadowing of objects at different distances from the viewer also contribute to the three-dimensional effect.

A three-dimensional workspace is typically perceived as being viewed from a position within the workspace. This position is a viewpoint. This viewpoint provides the virtual interface between the display user and the display. The viewpoint's direction of orientation is the direction from the viewpoint into the field of view along the axis at the center of the field of view.

In order to present a three-dimensional workspace, a system may store data indicating "coordinates" of the position of an object, a viewpoint or other display feature in the workspace. Data indicating coordinates of a display feature can then be used in presenting the display feature so that it is perceptible as positioned at the indicated coordinates. The "distance" between two display features is the perceptible distance between them and can be determined from their coordinates if they are presented so that they appear to be positioned at their coordinates. It is in this manner that the distances of the collision barriers of this invention from their objects are established.

Techniques for providing and handling three-dimensional objects in a three-dimensional virtual workspace have been developed in the art and are available to display user interface designers. U.S. Pat. No. 5,276,785 (Mackinlay et al., Jan. 4, 1994) is an example of the design techniques available to such three-dimensional workspace interface designers.

The three-dimensional workspace or landscape is navigable using conventional three-dimensional navigation techniques. A user may move around or navigate within the three-dimensional data representation to alter his perspective and view of the displayed representation of the data. Thus, a user may be referred to as a navigator. The navigator is actually stationary, and his view of the display space changes to give him the sensation of moving within the three-dimensional graphical space. Thus, we speak in terms of the navigator's perceived motion when we refer to changes in his view of the display space. As the user moves, his view of the data changes accordingly within the three-dimensional data representation. Some navigation modes include browsing, searching and data movement. U.S. Pat. No. 5,555,354 (Strasnick et al., Sep. 10, 1996) describes some known navigation techniques.

The programs are written in human readable script and this script is provided to another program called a compiler to generate a machine readable numeric code which can be loaded into, and directly executed by the computer. The C++ language possesses certain characteristics which allow a software developer to easily use programs written by others while still providing a great deal of control over the reuse of programs to prevent their destruction or improper use. The C++ language is well known and many articles and text are available which describe the language in detail.

While the embodiment of the present invention, which will be subsequently described, can be implemented using object oriented techniques involving the C++ programming language, we found it preferable to use SCL as used in VRT: the Virtual Reality Toolkit developed and marketed by Superscape Ltd. having U.S. offices in Palo Alto, California.

6,014,145

5

Extensive details of these programming techniques may be found in the Superscape VRT, Reference Manual, Version 4-00, 2d Edition, Jan. 29, 1996.

It should be understood by those skilled in the art that object oriented programming techniques involve the definition, creation, use and instruction of "objects". These objects are software entities comprising data elements and routines, or methods, which manipulate the data elements. The data and related methods are treated by the software as an entity and can be created, used and deleted as such. The data and functions enable objects to model their real world equivalent entity in terms of its attributes, which can be presented by the data elements, and its behavior which can be represented by its methods. Thus, in implementing the present invention, the collision barrier associated with objects may be regarded and stored as part of the software entity.

Objects are defined by creating "classes" which are not objects themselves, but which act as templates which instruct a compiler how to construct the actual object. For example, a class may specify the number and type of data variables and the steps involved in the functions which manipulate the data. An object is actually created in the program by means of a special function called a constructor which uses the corresponding class definition and additional information, such as arguments provided during object creation, to construct the object. Objects are destroyed by a special function called a destructor.

Many benefits arise out of three basic properties of object oriented programming techniques, encapsulation, polymorphism and inheritance. Objects can be designed to hide, or encapsulate, all or a portion of, the internal data structure and the internal functions. More particularly, during program design, a program developer can define objects in which all or some of the data variables and all or some of the related method are considered "private" or for use only by the object itself. Other data or methods can be declared "public" or available for use by other software programs. Access to the private variables and methods by other programs can be controlled by defining public methods which access the object's private data. The public methods form an interface between the private data and external programs. An attempt to write program code which directly accesses the private variables causes a compiler to generate an error during program compilation. This error stops the compilation process and presents the program from being run.

Polymorphism allows objects and functions which have the same overall format, but which work with different data, to function differently to produce consistent results. For example, an addition method may be defined as variable A+variable B, (A+B). The same format can be used whether the A and B are numbers, characters or dollars and cents. However, the actual program code which performs the addition may differ widely depending on the type of variables which comprise A and B. Thus, each type of variable (numbers, characters and dollars). After the methods have been defined, a program can later refer to the addition method by its common format (A+B) and, during compilation, the compiler will determine which of the three methods to be used by examining the variable types. The compiler will then substitute the proper function code.

A third property of object oriented programming is inheritance which allows program developers to reuse pre-existing programs. Inheritance allows a software developer to define classes and the objects which are later created from them as related through a class hierarchy. Specifically,

6

classes may be designated as subclasses of other base classes. A subclass "inherits" and has access to all of the public functions of its base classes as though these functions appeared in the subclass. Alternatively, a subclass can override some or all of its inherited functions or may modify some or all of its inherited functions by defining a new function with the same form.

The creation of a new subclass borrowing the functionality of another class allows software developers to easily customize existing code to meet their particular needs.

Although object oriented programming offers significant improvements over other programming concepts, program development still requires significant outlays of time and effort, especially if no pre-existing software programs are available for modification. Consequently, a set of predefined, interconnected classes are sometimes provided to create a set of objects and additional miscellaneous routines which are all directed to performing commonly encountered tasks in a particular environment. Such predefined classes and libraries are typically called "frameworks" and essentially provide a prefabricated structure as a basis for creating a working application program.

In object oriented programming such as the previously described VRT software platform, there is provided for the user interface a framework containing a set of predefined interface objects. The framework contains predefined classes which can be used as base classes and a developer may accept and incorporate some of the objects into these base classes, or he may modify or override objects or combinations of objects in these base classes to extend the framework and create customized solutions in particular areas of expertise.

This object oriented approach provides a major advantage over traditional programming since the programmer is not changing the original program, but rather extending the capabilities of the original program.

The above-described Superscape Virtual Reality Toolkit (VRT) provides the architectural guidance and modeling, but at the same time frees developers to supply specific actions unique to the particular problem domain which the developer is addressing. Those skilled in the art will understand how the present invention is implemented using object oriented programming techniques as described above.

With this background of the various expedients which may be used to implement the present invention, the preferred embodiments will now be described.

Referring to FIG. 1, a typical data processing system is shown which may be used in conjunction with object oriented software in implementing the present invention. A central processing unit (CPU), such as one of the PowerPC microprocessors available from International Business Machines Corporation (PowerPC is a trademark of International Business Machines Corporation) is provided and interconnected to various other components by system bus 12. An operating system 41 runs on CPU 10 and provides control and is used to coordinate the function of the various components of FIG. 1. Operating system 41 may be one of the commercially available operating systems such as DOS, or the OS/2 operating system available from International Business Machines Corporation (OS/2 is a trademark of International Business Machines Corporation). A program application such as the program in the above-mentioned VRT platform 40 runs in conjunction with operating system 41 and provides output calls to the operating system 41 which implements the various functions to be performed by the application 40.

6,014,145

7

A read only memory (ROM) 16 is connected to CPU 10, via bus 12 and includes the basic input/output system (BIOS) that controls the basic computer functions. Random access memory (RAM) 14, I/O adapter 18 and communications adapter 34 are also interconnected to system bus 12. It should be noted that software components including the operating system 41 and application 40 are loaded into RAM 14 which is the computer system's main memory. I/O adapter 18 may be a small computer system interface (SCSI) adapter that communicates with the disk storage device 20, i.e. a hard drive. Communications adapter 34 interconnects bus 12 with an outside network enabling the data processing system to communicate with other such systems over a local area network (LAN), wide area network (WAN), or the like. I/O devices are also connected to system bus 12 via user interface adapter 22 and display adapter 36. Keyboard 24, trackball 32, mouse 26 and speaker 28 are all interconnected to bus 12 through user interface adapter 22. Display adapter 36 includes a frame buffer 39 which is a storage device that holds a representation of each pixel on the display screen 38. Images may be stored in frame buffer 39 for display on monitor 38 through various components such as a digital to analog converter (not shown) and the like. By using the aforementioned I/O devices, a user is capable of inputting information to the system through the keyboard 24, trackball 32 or mouse 26 and receiving output information from the system via speaker 28 and display 38.

There will now be described a simple illustration of the present invention. When the images are described, it will be understood that these may be rendered by storing a virtual reality three-dimensional image creation program such as the previously described VRT of Superscape in the RAM 14 of the system of FIG. 1. Also stored on the RAM will be a suitable operating system such as DOS or Windows. The operating system of the VRT application is diagrammatically shown in FIG. 1 as operating system 41 in which application 40 operates.

An embodiment of the present invention will now be described starting with respect to the task specific portion of a virtual reality three-dimensional workspace shown in FIG. 2. Workspace 42 has many objects, among them: bookshelves 43, desk 44, podium 45, window wall 46, painting 47, shelves 48 and 49. Let us consider the image in FIG. 2 a view point of a three-dimensional space presented to the viewer at a display interface such as that which could be shown on display monitor 38 of FIG. 1. In accordance with conventional techniques, the user may control the viewpoint 50 through conventional I/O devices such as mouse 26 in FIG. 1 which operates through user interface 22 to call upon the VRT programs in RAM 14 cooperating with the operating system 41 to create the images in frame buffer 39 of display adapter 36 to control the display on monitor 38. Using conventional virtual three-dimensional workspace navigation techniques, the viewpoint interface of the user shown in FIG. 2 is changeable as the user moves closer or backs away from objects in the workspace or moves to the right or left in the workspace. All this may be controlled by a suitable I/O device such as mouse 26 of FIG. 1.

While for simplicity of illustration, the view of the workspace shown in FIG. 3 which is a top view of the space shown in three dimensions in FIG. 2 is presented in a single plane in FIG. 3, it should be understood that the movement may be along any path in the three orthogonal: x y and z directions.

With reference to FIG. 3, the viewpoint 50 which is the point from which the field of view shown in FIG. 2 is viewed by the user, is shown as crosspoint 50. The workplane 42 of

8

FIG. 3 has all of the objects in FIG. 2 presented in a plan or overhead view: bookcase 43, desk 44, podium 45, window wall 46, painting 47, shelves 48 and bookcase 49. The collision barrier associated with each of these objects is shown as a continuous dashed line 51 spaced from these objects by a distance d which varies with the nature of the object. Thus the section 52 of collision barrier 51 which is close to desk 44 is at a relatively short distance from the periphery of the desk 44. The reason for this is that desk 44 as shown in FIG. 2 is a low lying impediment. Thus, when the viewpoint is stopped short of the object by the collision barrier, the viewpoint will be such that the user can easily select the navigational path or branch since he will be able to see over the low lying object. On the other hand, the section 53 of the collision barrier 51 which is near bookcase 43 is at a relatively substantial distance from the bookcase. As seen from FIG. 2 bookcase 43 is quite tall and the viewer at the stopped viewpoint adjacent to bookcase 43 must have a viewpoint that is distanced so that he can see around the bookcase in order to decide the most appropriate navigational path. Similarly, section 54 of collision barrier 51 near painting 47 is also at a substantial distance from it's painting object 47. This is because the painting in combination with shelves 48 is a formidable and tall barrier from which the viewer has to be distanced in order to best select an alternate navigational path. In addition, the distance at section 54 provides the viewer or user with an optimum distance from which he may if he desires study painting 47.

As set forth hereinabove, in accordance with an additional aspect of the present invention the viewpoint 50 may have an optional viewpoint collision barrier which is depicted in top view of FIG. 3 as dashed line 55. Thus if collision barrier 55 is optionally turned on, then the viewpoint will stop when viewpoint collision barrier 55 touches object collision barrier 53 at any point. On the other hand if the viewpoint collision barrier 55 is not turned on, then the viewpoint 50 will stop when it touches object collision barrier 51.

It should be understood that both the object collision barrier 51 and viewpoint collision barrier 55 if the later is optionally rendered operational, may both be setup so as to be interactively changeable by the user i.e., user may interactively change distance d or change the distance from collision barrier 55 to the viewpoint. This is usually desirable in systems where the user may interactively alter his objects or their positions. In such a case, the user may need the ability to change object collision barriers to accommodate changes in potential navigation views brought about by such changes in the objects. Even further, there may be systems in which the system itself under certain circumstances may automatically change objects. In such cases, the system may be setup so as to automatically also alter the collision barriers to accommodate the change in potential navigational views resulting in such object changes.

Now with reference to FIGS. 4A and 4B, we will describe a process implemented by the present invention in conjunction with the flowcharts of FIGS. 4A and 4B. First, the steps in FIG. 4A relate to the development of the virtual reality workscape, the functional object and their positioning in the workscape in accordance with the present invention using the previously described Superscape VRT programming toolkit. It also includes the development for each object of a collision barrier at a preselected distance from the object periphery. First, step 56, the desired virtual reality three-dimensional workspace is created and stored. This would be, for example, the workspace shown in FIG. 2 and diagrammatically shown as a plan view of FIG. 3. Next, step 57, the virtual reality three-dimensional objects which will be

6,014,145

9

placed in a landscape are created and stored. Then, step 58, a collision barrier is selected for each object at a preselected distance from the object periphery. Then, step 59, such collision barriers are stored in association with their respective corresponding objects.

Next, step 60, there is provided and stored navigation means for changing the viewpoint of the viewer at the display interface responsive to the viewer interactively selecting appropriate navigation paths. These navigation means can be any conventional navigation means either for proceeding along a particular path. Next, step 61, a viewpoint collision barrier is created and stored. This barrier will be a preselected distance from the viewpoint and will normally be inactive but may be optionally activated. Then, step 62, means are provided and stored for interactively changing both the object and viewpoint collision barrier distances.

The process now proceeds to point A in FIG. 4B whereat the created virtual reality landscape program is run, step 63. As previously mentioned, the program is run on a system such as that shown in FIG. 1 with particular application programs being loaded on RAM 14, connected to display buffer 36 which forms the stored images via frame buffer 39 controlling the display monitor 38. The program initially sets up the workspace layout on the display, step 64; this includes laying out the objects as well as their corresponding object collision barriers. Now, before there is any navigation by means of moving a viewpoint a determination is made, decision step 65 as to whether the viewpoint collision barrier is active. Let us first assume that the collision barrier around the viewpoint is not active, resulting in a no from step 65; the system then begins to navigate through a sequence of viewpoints, step 66. At each sequential viewpoint, a decision or determination is made, step 67 as to whether the viewpoint has reached an object collision barrier. If it has not, then the system returns to navigation step 66 and the navigation through a sequence of viewpoints along a particular path continues. On the other hand, if the decision from step 67 is that an object collision barrier has been reached, the viewpoint stops, step 70.

Considering now the flow of the process from decision step 65 if it is determined that the viewpoint has its optional collision barrier active, then the system proceeds to step 68 where the viewpoint is navigated and a determination is made, step 69, as to whether the object collision barrier has touched or intersected the viewpoint collision barrier. If it has not, then the system returns to step 68 and the navigation continues. On the other hand if a determination is made in decision step 69 that the object collision barrier has intersected the viewpoint collision barrier, then the viewpoint is stopped again, step 70.

At this point, decision step 71, a determination is made as to whether the user wishes to end the session. Such decisions may be made by the user all along in the process. If it is the end of the session, yes from step 71, then the session is ended step 73. On the other hand, if the session is to continue, then step 72, the user is now stopped at a point where he may conveniently consider his options in selecting a changed navigation path from the stopped viewpoint. After he changes the navigation path, the flow returns to decision step 65 from this new navigation path, and the process continues as described above.

Although certain preferred embodiments have been shown and described, it will be understood that many changes and modifications may be made therein without departing from the scope and intent of the appended claims.

10

We claim:

1. A data processor controlled display system for displaying a virtual three-dimensional workspace comprising:

   means for displaying a plurality of virtual three-dimensional objects within said workspace;

   user interactive navigation means for moving users to a plurality of viewpoints within said workspace;

   means for storing in association with each of a plurality of said virtual objects, a collision barrier around the periphery of the object at a selected distance from the object, and

   means responsive to moving a user to a viewpoint intersecting the collision barrier of a selected object for stopping the viewpoint at said barrier.

2. The display system of claim 1 further including user-interactive means for changing the distance of a collision barrier from its associated object.

3. The display system of claim 1 further including means for changing at least one of said plurality of virtual three dimensional objects, and means responsive to said change for changing the distance of the collision barrier of said changed object from said changed object.

4. The display system of claim 3 wherein said means for changing said object, dynamically change said object.

5. The display system of claim 1 further including

   viewpoint collision barrier means tracking each of said viewpoints during navigation at a selected distance from said viewpoint, and

   means, responsive to moving a user to a viewpoint whereat the viewpoint collision barrier intersects the collision barrier of an object, for stopping said viewpoint.

6. The display system of claim 5, further including means, responsive to moving a user to a viewpoint whereat the viewpoint collision barrier intersects the periphery of an object without a collision barrier, for stopping said viewpoint.

7. A computer implemented method for displaying a virtual three-dimensional workspace comprising:

   displaying a plurality of virtual three-dimensional objects within said workspace;

   user-interactively moving users to a plurality of viewpoints within said workspace;

   storing in association with each of a plurality of said virtual objects, a collision barrier around the periphery of the object at a selected distance from the object, and

   responsive to moving a user to a viewpoint intersecting the collision barrier of a selected object, stopping the viewpoint at said barrier.

8. The method of claim 7 further including the step of changing the distance of a collision barrier from its associated object.

9. The method of claim 7 further including

   the step of changing at least one of said plurality of virtual three dimensional objects, and

   responsive to said change, the step of changing the distance of the collision barrier of said changed object from said changed object.

10. The method of claim 9 wherein said object is dynamically changed.

11. The method of claim 7 further including the steps of:

   providing a viewpoint collision barrier tracking each of said viewpoints during navigation at a selected distance from said viewpoint, and

   responsive to moving a user to a viewpoint whereat the viewpoint collision barrier intersects the collision barrier of an object, stopping said viewpoint.

6,014,145

**11**

12. A computer program having data structures included on a computer readable medium which causes the display on a data processor supported display of a virtual three-dimensional workspace comprising:

means for displaying a plurality of virtual three-dimensional objects within said workspace;

user interactive navigation means for moving users to a plurality of viewpoints within said workspace;

means for storing in association with each of a plurality of said virtual objects, a collision barrier around the periphery of the object at a selected distance from the object, and

means responsive to moving a user to a viewpoint intersecting the collision barrier of a selected object for stopping the viewpoint at said barrier.

13. The computer program according to claim 12 further including user-interactive means for changing the distance of a collision barrier from its associated object.

14. The computer program according to claim 12 further including means for changing at least one of said plurality of virtual three dimensional objects, and means responsive to said change for changing the distance of the collision barrier of said changed object from said changed object.

15. The computer according to claim 14 wherein said means for changing said object, dynamically change said object.

16. The computer program according to claim 12 further including

viewpoint collision barrier means tracking each of said viewpoints during navigation at a selected distance from said viewpoint, and

means, responsive to moving a user to a viewpoint whereat the viewpoint collision barrier intersects the collision barrier of an object, for stopping said viewpoint.

17. The computer program according to claim 16, further including means, responsive to moving a user to a viewpoint whereat the viewpoint collision barrier intersects the periphery of an object without a collision barrier, for stopping said viewpoint.

18. A data processor controlled display system for displaying a virtual three-dimensional workspace comprising:

means for displaying a plurality of virtual three-dimensional objects within said workspace;

**12**

user interactive navigation means for moving users to a plurality of viewpoints within said workspace;

viewpoint collision barrier means tracking each of said viewpoints during navigation at a selected distance from said viewpoint, and

means, responsive to moving a user to a viewpoint whereat the viewpoint collision barrier intersects the periphery of an object, for stopping said viewpoint.

19. The display system of claim 18, further including means changing the distance of said collision barrier from said viewpoint.

20. A computer implemented method for displaying a virtual three-dimensional workspace comprising:

displaying a plurality of virtual three-dimensional objects within said workspace;

user-interactively moving users to a plurality of viewpoints within said workspace;

providing a viewpoint collision barrier tracking each of said viewpoints during navigation at a selected distance from said viewpoint, and

responsive to moving a user to a viewpoint whereat the viewpoint collision barrier intersects the periphery of an object, stopping said viewpoint.

21. The method of claim 20 further including the step of changing the distance of said collision barrier from said viewpoint.

22. A computer program having data structures included on a computer readable medium which causes the display on a data processor supported display of a virtual three-dimensional workspace comprising:

means for displaying a plurality of virtual three-dimensional objects within said workspace;

user interactive navigation means for moving users to a plurality of viewpoints within said workspace;

viewpoint collision barrier means tracking each of said viewpoints during navigation at a selected distance from said viewpoint, and

means, responsive to moving a user to a viewpoint whereat the viewpoint collision barrier intersects the periphery of an object, for stopping said viewpoint.

23. The computer program according to claim 22, further including means changing the distance of said collision barrier from said viewpoint.

\* \* \* \* \*

**EXHIBIT B**



US005883628A

# United States Patent [19]

## Mullaly et al.

[11] **Patent Number:** 5,883,628

[45] **Date of Patent:** Mar. 16, 1999

[54] **CLIMABILITY: PROPERTY FOR OBJECTS IN 3-D VIRTUAL ENVIRONMENTS**

[75] Inventors: **John Martin Mullaly; Didier Daniel Claude Bardon**, both of Austin; **Richard Edmond Berry; Scott Harlan Isensee**, both of Georgetown; **Shirley Lynn Martin**, Austin, all of Tex.

[73] Assignee: **International Business Machines Corporation**, Armonk, N.Y.

[21] Appl. No.: **887,806**

[22] Filed: **Jul. 3, 1997**

[51] Int. Cl.$^6$ .......................................... G06F 3/00
[52] U.S. Cl. ...................................................... 345/355
[58] Field of Search ................................. 345/355, 357

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,502,638 | 3/1996 | Takenaka ............................ 364/424.02 |
| 5,577,981 | 11/1996 | Jarvik .................................... 482/4 |
| 5,584,700 | 12/1996 | Feldman et al. ..................... 482/247 |
| 5,594,644 | 1/1997 | Hasegawa et al. ............ 364/424.027 |
| 5,737,533 | 4/1998 | de Hond ........................... 395/357 X |

### OTHER PUBLICATIONS

Spinney, L., "Seeing is unfreezing," New Scientist V. 153, Feb. 1997, p. 38–40.

Jacobson, J., "Collision avoidance in virtual environments," 1997 IEEE Int. Conf. on SMC pp. 1704–1709.

*Primary Examiner*—A. Katbab
*Attorney, Agent, or Firm*—Paul Kraft

[57] **ABSTRACT**

The problem addressed by this invention is that of resolving what occurs when a user's viewpoint comes into contact with an object residing in a three-dimensional workspace as the viewer navigates through that workspace. There are several possibilities in such a situation. For example, the viewer's viewpoint may be stopped and prevented from advancing further or it may penetrate the object. The instant invention provides a climbability property for objects in 3-D virtual environments. This property, when stored in the software along with the properties which define that object, can alter the viewer's viewpoint such that it will automatically be adjusted to simulate the behavior of climbing over the object.

**17 Claims, 9 Drawing Sheets**







U.S. Patent

Mar. 16, 1999

Sheet 1 of 9

5,883,628



FIG. 1

**U.S. Patent**          Mar. 16, 1999          Sheet 2 of 9          **5,883,628**



FIG. 2

100

102

U.S. Patent          Mar. 16, 1999          Sheet 3 of 9          5,883,628



FIG. 3A

U.S. Patent          Mar. 16, 1999          Sheet 4 of 9          5,883,628



FIG. 3B

204

205

EX. B    PG. 23



FIG. 3C

EX. B    PG. 24



FIG. 4A

U.S. Patent        Mar. 16, 1999        Sheet 7 of 9        5,883,628



FIG. 4B

**U.S. Patent**          Mar. 16, 1999          Sheet 8 of 9          **5,883,628**



FIG. 4C

305

306

307



FIG. 5

5,883,628

## 1

### CLIMABILITY: PROPERTY FOR OBJECTS IN 3-D VIRTUAL ENVIRONMENTS

#### TECHNICAL FIELD

The present invention relates to user interactive computer supported display technology and particularly to such user interactive systems and methods which are user friendly, i.e. provide even noncomputer literate users with an interface environment which is easy to use and intuitive.

#### BACKGROUND OF THE INVENTION AND PRIOR ART

The 1990's decade has been marked by a societal technological revolution driven by the convergence of the data processing industry with the consumer electronics industry. This advance has been even further accelerated by the extensive consumer and business involvement in the internet over the past two years. As a result of these changes, it seems as if virtually all aspects of human endeavor in the industrialized world requires human-computer interfaces. As a result of these profound changes, there is a need to make computer directed activities accessible to a substantial portion of the world's population which, up to a year or two ago, was computer-illiterate, or at best computer indifferent. In order for the vast computer supported market places to continue and be commercially productive, it will be necessary for a large segment of computer indifferent consumers to be involved in computer interfaces. Thus, the challenge of our technology is to create interfaces to computers which are as close to the real world as possible.

Industry has been working towards this challenge and there is presently a relatively high degree of realism possible in interfaces. This presents a need and an opportunity for even more realistic interaction techniques to better match the visual metaphors used and to achieve a higher level of ease of use for computer systems. We are striving towards the representation of object as photo realistic, three-dimensional (3D) models rather than as the icons and two-dimensional desktops of conventional computer technology.

Some examples of current technology for the creation of virtual three-dimensional workspace display interfaces are copending application Ser. No. 08/753,081, entitled "CREATING REAL WORLD OBJECTS" and Ser. No. 08/753, 076, entitled "SYSTEM AND METHOD FOR MAINTAINING SIZE AND POSITION RELATIONSHIPS FOR NONRECTANGULAR REAL WORLD OBJECTS", assigned to the Assignee of the present application.

A 3D virtual workspace display environment is also described in an article entitled, "RAPID CONTROLLED MOVEMENT THROUGH A VIRTUAL 3D WORKSPACE", Jock Mackinlay et al., *Computer Graphics Publication*, Vol. 24, No. 4, August 1990, pp. 171–175, as well as in its related U.S. Pat. No. 5,276,785.

A more recent copending application assigned to the Assignee of the present invention is Ser. No. 08/813,891, entitled, "VIEWER INTERACTIVE OBJECT IN VIRTUAL THREE-DIMENSIONAL WORKSPACE", D. Bardon et al., which covers face views of virtual three-dimensional objects which may be triggered to appear on a display by interactive viewer input.

It is clear that current technology in virtual three-dimensional workspaces has provided environments which are user friendly, i.e. make the casual computer user feel more comfortable and at home with the interface. However, researchers in human factors have found downsides to

## 2

three-dimensional virtual reality displays. Because of the many choices that the user has in wandering down various "streets and roads" or visiting a wide variety of "buildings or stores" or going through many possible "doors", the user may wander through this reality and perhaps get lost from the track or goal he is pursuing.

The present invention addresses this problem, i.e. that of helping the interactive user in three-dimensional graphic environments to stay focused and relate to the objects he is seeking to relate to in the manner he is seeking to relate to such objects even when these objects are arranged in 3D space in what appears to be infinite configurations. This invention also facilitates the design of 3-D environments which then facilitate the tasks of the end users.

In these virtual reality 3D environments as in the real world, the viewer or user is relating to the virtual objects in order to carry out a wide variety of tasks, some of which are quite simple and some very complex. In order for the user to stay focused and carry out his tasks as expeditiously as possible, it would be optimum for the virtual 3D system to provide simpler user interfaces for simple tasks and more comprehensive user interfaces for more complex tasks.

Thus, when the viewer's task is a simple one such as getting more information about a current movie film or about a newly released music CD, the user may be presented with his information in an interface as simple as a face view of a virtual 3D object which contains the information. For example, in the virtual 3D world or workspace, the viewer may navigate to a virtual three-dimensional object of a theater and get his desired movie film information from a face view of the object which presents a marquee of the theater. Similarly, the viewer seeking CD information might navigate to and be presented with a face view of a virtual CD vending kiosk which presents him with his desired information. The above-mentioned patent application, "VIEWER INTERACTIVE OBJECT IN VIRTUAL THREE-DIMENSIONAL WORKSPACE", D. B. Bardon et al., describes such face views of 3D virtual objects. With such simple tasks, the viewer notes his desired information, perhaps makes some simple choices and moves on with his navigation through the virtual 3D workspace.

On the other hand, the navigating viewer's task may be a more complex one like tracking and updating product sales information of a business or group of businesses or within a report or filing a tax statement.

#### SUMMARY OF THE INVENTION

Before setting forth the present invention, we should establish some basic characteristics of the virtual three-dimensional environment as described in the above-referenced patents and applications. It is understood that in order to navigate through three-dimensional space, view the space or relate to objects within the space, a viewpoint is determined within that space. That viewpoint is the virtual position of the viewer or person who is navigating within the three-dimensional space. The viewpoint is commonly defined by its position and its orientation or direction. For purposes of describing this invention, we will use the metaphor of a camera to understand the viewpoint. The camera's position and orientation are where it is and which way it is pointing. Let us refer to another property of a viewpoint which is "field of view"; this is effectively the resulting view from a given viewpoint. A key need of a viewer navigating through virtual three-dimensional space is to stay focused.

As set forth above, it is easier to stay focused when the task for which he is accessing the object is a simple one. The

5,883,628

| 3 | 4 |

present invention deals with helping viewers to stay focused in more complex tasks.

The present invention operates within the previously described data processor controlled display system for displaying a virtual three-dimensional object having three-dimensional objects which are interactively functional, i.e. may be picked by the viewer or user for various computer interactive functions.

The present invention specifically provides the designer and/or user with a means of dealing with a situation wherein the viewer's viewpoint is confronted with an object in a 3-D virtual reality environment as they navigate through 3-D space. How do they deal with such a situation. This invention provides a mechanism for resolving this dilemma.

In three dimensional (3D) graphical environments, objects are arranged in three dimensional space and the users move through the space by moving their viewpoint within that space. Movement within 3D space which contains objects is an aspect human-computer interaction which presents many problems or challenges to the usability of software with 3D interfaces.

The specific problem addressed by this invention is that of resolving what occurs when a user's viewpoint and any embodiment attached to the viewpoint in the virtual space, such as a camera, vehicle or avatar, comes into contact with any of the objects residing in a 3-D environment. There are several possibilities in such a situation, such as,the viewpoint may be stopped and prevented from advancing further. Other possibilities are that it may be deflected away from the object, it may be allowed to penetrate the object or as described in the specifics of the instant invention it may climb up and over the object.

The instant invention provides a "climbability" property for objects in 3-D virtual environments. This property could then be set either by designers of 3-D objects or by users themselves. With such a property setting, when the user's viewpoint comes into contact with the object, the viewpoint will automatically be adjusted to simulate the behavior of climbing over the object.

In today's 3D virtual environments, the resolution of what happens when the user's viewpoint comes in contact with objects is handled in a variety of ways. This includes stopping the movement of the viewpoint, deflecting the viewpoint, allowing the viewpoint to penetrate the object, or as the instant "climbability" invention demonstrates, having the viewpoint climb over the object. However currently there is no means provided to the user or to designers of objects for virtual environments, which would allow them to control the climbability behavior of specific objects. There is no mechanism that would support climbability as a property of an object which may be controlled by a designer and or user and is independent of the user or the user's chosen navigation mechanism.

The inventors believe that their solution is novel and the best solution to the problem. By this is meant the ability of being able to have the designers of objects for a 3-D environment, and or users of these environments, to control what happens when the user's viewpoint comes into contact with objects. Additionally, it allows them to specify that the object is "climbable" so that the viewpoint is automatically adjusted to simulate the effect of "climbing" over the object.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a data processing system including a central processing unit which is capable of implementing the present invention;

FIG. 2 shows examples of two unrelated objects in virtual 3 dimensional workspace,they are a desk and a stair case to another landing.

FIG. 3A through 3C demonstrate that the property of "penetrability" of the virtual 3 dimensional object, such as a desk. Thus the user's path of navigation to the door involves penetration through the desk. The trajectory of the viewpoint toward the door, is unaffected by the presence of the desk.

FIGS. 4A through 4C, represent the embodiment of the instant application. They demonstrate the property of "climbability" of the virtual 3 dimensional object, such as a staircase, which can be can be stored in the software along with the properties that define the object itself. Thus the user's viewpoint comes into contact with the staircase object, on the path of navigation to reach a door at the top of a staircase, the viewpoint automatically adjusts to simulate the behavior of climbing the stairs to reach the door.

FIG. 5 is a flowchart for the process implemented by the present invention for creating the effect of a climbing means to adjust the user's viewpoint, when the user's viewpoint comes into contact with an object in virtual 3-D space. As a result, the viewpoint will automatically be adjusted to simulate the behavior of climbing over the object to reach the desired 3-D object.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENT

Before going into the details of specific embodiments, it will be helpful to understand from a more general perspective the various elements and method which may be used to implement the present invention. The present invention is implemented in three-dimensional virtual workspace. A three-dimensional workspace is a workspace that is perceived as extending in three orthogonal directions. Typically a display has a two-dimensional display surface and the perception of a third dimension is effected by visual clues such as perspective lines extending toward a vanishing point. Distant objects are obscured by nearer objects. The three-dimensional effect is also provided by showing changes in objects as they move toward or away from the viewer. Perspective shading of objects and a variety of shadowing of objects at different distances from the viewer also contribute to the three-dimensional effect.

A three-dimensional workspace is typically perceived as being viewed from a position within the workspace. This position is a viewpoint. This viewpoint provides the virtual interface between the display user and the display. The viewpoint's direction of orientation is the direction from the viewpoint into the field of view along the axis at the center of he field of view.

In order to present a three-dimensional workspace, a system may store data indicating "coordinates" of the position of an object, a viewpoint or other display feature in the workspace. Data indicating coordinates of a display feature can then be used in presenting the display feature so that it is perceptible as positioned at the indicated coordinates. The "distance" between two display features is the perceptible distance between them, and can be determined from their coordinates if they are presented so that they appear to be positioned at their coordinates.

Techniques for providing and handling three-dimensional objects in a three-dimensional virtual workspace have been developed in the art and are available to display user interface designers. U.S. Pat. No. 5,276,785 (Mackinlay et al., Jan. 4, 1994) is an example of the design techniques available to such three-dimensional workspace interface designers.

5,883,628

| 5 | 6 |

The description of the present invention often refers to navigation within the three-dimensional virtual workspace. The workspace or landscape is navigable using conventional three-dimensional navigation techniques. A user may move around or navigate within the three-dimensional data representation to alter his perspective and view of the displayed representation of the data. Thus, a user may be referred to as a navigator. The navigator is actually stationary, and his view of the display space changes to give him the sensation of moving within the three-dimensional graphical space. Thus, we speak in terms of the navigator's perceived motion when we refer to changes in his view of the display space. As the user moves, his view of the data changes accordingly within the three-dimensional data representation. Some navigation modes include browsing, searching and data movement. U.S. Pat. No. 5,555,354 (Strasnick et al., Sep. 10, 1996) describes some known navigation techniques.

The three-dimensional objects which will be subsequently described in embodiments of the present invention may be best implemented using object oriented programming techniques, such as the object oriented techniques described in the above-mentioned copending application Ser. No. 08/753,076 assigned to the Assignee of the present invention. The objects of that copending application are implemented using the C++ programming language. C++ is a compiled language.

The programs are written in human readable script and this script is provided to another program called a compiler to generate a machine readable numeric code which can be loaded into, and directly executed by the computer. The C++ language possesses certain characteristics which allow a software developer to easily use programs written by others while still providing a great deal of control over the reuse of programs to prevent their destruction or improper use. The C++ language is well known and many articles and text are available which describe the language in detail.

While the embodiment of the present invention, which will be subsequently described, can be implemented using object oriented techniques involving the C++ programming language, we found it desirable to use SCL as used in VRT: the Virtual Reality Toolkit developed and marketed by Superscape Ltd. having U.S. offices in Palo Alto, Calif. Extensive details of these programming techniques may be found in the Superscape VRT, Reference Manual, Version 4-00, 2d Edition, Jan. 29, 1996.

It should be understood by those skilled in the art that object oriented programming techniques involve the definition, creation, use and instruction of "objects". These objects are software entities comprising data elements and routines, or methods, which manipulate the data elements. The data and related methods are treated by the software as an entity and can be created, used and deleted as such. The data and functions enable objects to model their real world equivalent entity in terms of its attributes, which can be presented by the data elements, and its behavior which can be represented by its methods.

Objects are defined by creating "classes" which are not objects themselves, but which act as templates which instruct a compiler how to construct the actual object. For example, a class may specify the number and type of data variables and the steps involved in the functions which manipulate the data. An object is actually created in the program by means of a special function called a constructor which uses the corresponding class definition and additional information, such as arguments provided during object creation, to construct the object. Objects are destroyed by a special function called a destructor.

Many benefits arise out of three basic properties of object oriented programming techniques, encapsulation, polymorphism and inheritance. Objects can be designed to hide, or encapsulate, all or a portion of, the internal data structure and the internal functions. More particularly, during program design, a program developer can define objects in which all or some of the data variables and all or some of the related method are considered "private" or for use only by the object itself. Other data or methods can be declared "public" or available for use by other software programs. Access to the private variables and methods by other programs can be controlled by defining public methods which access the object's private data. The public methods form an interface between the private data and external programs. An attempt to write program code which directly accesses the private variables causes a compiler to generate an error during program compilation. This error stops the compilation process and presents the program from being run.

Polymorphism allows objects and functions which have the same overall format, but which work with different data, to function differently to produce consistent results. For example, an addition method may be defined as variable A+variable B, (A+B). The same format can be used whether the A and B are numbers, characters or dollars and cents. However, the actual program code which performs the addition may differ widely depending on the type of variables which comprise A and B. After the methods have been defined, a program can later refer to the addition method by its common format (A+B) and, during compilation, the compiler will determine which of the three methods to be used by examining the variable types. The compiler will then substitute the proper function code.

A third property of object oriented programming is inheritance which allows program developers to reuse pre-existing programs. Inheritance allows a software developer to define classes and the objects which are later created from them as related through a class hierarchy. Specifically, classes may be designated as subclasses of other base classes. A subclass "inherits" and has access to all of the public functions of its base classes as though these functions appeared in the subclass. Alternatively, a subclass can override some or all of its inherited functions or may modify some or all of its inherited functions by defining a new function with the same form.

The creation of a new subclass borrowing the functionality of another class allows software developers to easily customize existing code to meet their particular needs.

Although object oriented programming offers significant improvements over other programming concepts, program development still requires significant outlays of time and effort, especially if no pre-existing software programs are available for modification. Consequently, a set of predefined, interconnected classes are sometimes provided to create a set of objects and additional miscellaneous routines which are all directed to performing commonly encountered tasks in a particular environment. Such predefined classes and libraries are typically called "frameworks" and essentially provide a prefabricated structure as a basis for creating a working application program.

In object oriented programming such as the previously described VRT software platform, there is provided for the user interface a framework containing a set of predefined interface objects. The framework contains predefined classes which can be used as base classes and a developer may accept and incorporate some of the objects into these base classes, or he may modify or override objects or

5,883,628

7

combinations of objects in these base classes to extend the framework and create customized solutions in particular areas of expertise.

This object oriented approach provides a major advantage over traditional programming since the programmer is not changing the original program, but rather extending the capabilities of the original program.

The above-described Superscape Virtual Reality Toolkit (VRT) provides the architectural guidance and modeling, but at the same time frees developers to supply specific actions unique to the particular problem domain which the developer is addressing.

Therefore, those skilled in the art will understand how the present invention is implemented using object oriented programming techniques as described above.

Referring to FIG. 1, a typical data processing system is shown which may be used in conjunction with object oriented software in implementing the present invention. A central processing unit (CPU), such as one of the PowerPC microprocessors available from International Business Machines Corporation (PowerPC is a trademark of International Business Machines Corporation) is provided and interconnected to various other components by system bus 12. An operating system 41 runs on CPU 10 and provides control and is used to coordinate the function of the various components of FIG. 1. Operating system 41 may be one of the commercially available operating systems such as DOS, or the OS/2 operating system available from International Business Machines Corporation (OS/2 is a trademark of International Business Machines Corporation). A program application such as the program in the above-mentioned VRT platform 40 runs in conjunction with operating system 41 and provides output calls to the operating system 41 which implements the various functions to be performed by the application 40.

A read only memory (ROM) 16 is connected to CPU 10, via bus 12 and includes the basic input/output system (BIOS) that controls the basic computer functions. Random access memory (RAM) 14, I/O adapter 18 and communications adapter 34 are also interconnected to system bus 12. It should be noted that software components including the operating system 41 and application 40 are loaded into RAM 14 which is the computer's main memory. I/O adapter 18 may be a small computer system interface (SCSI) adapter that communicates with the disk storage device 20, i.e. a hard drive. Communications adapter 34 interconnects bus 12 with an outside network enabling the data processing system to communicate with other such systems over a local area network (LAN), wide area network (WAN), or the like. I/O devices are also connected to system bus 12 via user interface adapter 22 and display adapter 36. Keyboard 24, trackball 32, mouse 26 and speaker 28 are all interconnected to bus 12 through user interface adapter 22. Display adapter 36 includes a frame buffer 39 which is a storage device that holds a representation of each pixel on the display screen 38. Images may be stored in frame buffer 39 for display on monitor 38 through various components such as a digital to analog converter (not shown) and the like. By using the aforementioned I/O devices, a user is capable of inputting information to the system through the keyboard 24, trackball 32 or mouse 26 and receiving output information from the system via speaker 28 and display 38.

There will now be described a simple illustration of the present invention. When the images are described, it will be understood that these may be rendered by storing a virtual reality three-dimensional image creation application pro-

8

gram 40 such as the previously described VRT of Super-scape in the RAM 14 of the system of FIG. 1. Also stored on the RAM will be a suitable operating system 41 such as DOS or Windows.

An embodiment of the present invention will now be described with respect to the virtual reality workspace shown in FIG. 2; which shows examples of two unrelated objects in virtual 3 dimensional workspace which are a desk 102 and a staircase 100 to another landing. In the case of the desk 102, we will subsequently see in FIGS. 3A–C, the properties of "penetrability" and contrast this with the property of "climbability" FIGS. 4A–C, the embodiment of the instant invention.

With regard to FIG. 3A, this demonstrates several objects that exist in three-dimensional workspace 200; specifically a desk 201 and a staircase 202 and a bookcase 203. The workspace 200 FIG. 3 as noted is shown as an office environment. The workspace 200 is centered within a view-point interface which is presented to the viewer on display monitor 38 of FIG. 1. In accordance with conventional techniques, the user may control the viewpoint 200A through a conventional I/O device such as mouse 26 or FIG. 1 which operates through the user interface 22 of FIG. 1 to call upon VRT programs in RAM 14 operating with the operating system 41 to create the images in frame buffer 39 of display adapter 36 to control the display on monitor 38. Using conventional virtual three-dimensional workspace navigation techniques, the viewpoint interface 200A of FIG. 3A is changeable as the viewer moves closer or backs away from objects in the workspace or moves to right or to the left in the workspace. All this may be controlled by a suitable I/O device such as mouse 26 of FIG. 1. The previously mentioned images of these objects within workspace 200, as well as the object images for the staircase 304 of FIG. 4 and the door 305 of FIG. 4-C within workspace 302 FIG. 4-C, are stored as data from which the objects may be created on the display in RAM 14 of FIG. 1 in connection with the VRT program.

FIGS. 3A through 3C demonstrate that the property of "penetrability" of the virtual 3 dimensional object,such as a desk 201 and a door 202 and a book case 203 as in FIG. 3A. The viewpoint of the viewer for this three dimensional work-space is 200 The property of "penetrability" can be stored in the software along with the properties that define the desk object itself. Thus the user's path of navigation to the door 204 FIG. 3B, allows the viewpoint to penetrate through the desk, as a property which is stored in the software along with the properties that define the desk 205 object. The trajectory of the viewpoint 207, FIG. 3C, toward the door 206, is unaffected by the presence of the desk.

This property of "penetrability", which can be stored in the software along with the properties that define a specific object such as the desk, is also considered to be unique behavior.

In contrast to FIGS. 3A–3C, FIGS. 4A through 4C, represent the embodiment of the instant application, "climbability". They demonstrate the property of "climbability" of the virtual 3 dimensional object, such as a staircase 300 of FIG. 4A, which can be can be stored in the software along with the properties that define the object itself. Thus the user's viewpoint 302 of FIG. 4A, comes into contact with the staircase object 300, on the path of navigation to reach a door 301 at the top of a staircase, the viewpoint automatically adjusts to simulate the behavior of climbing the stairs FIG. 4B, 304 to reach the door 303. This automatic viewpoint adjustment 307, FIG. 4C, continues

5,883,628

9

and simulates the effect of climbing of the staircase 306 to reach the door 305 FIG. 4C.

FIG. 5 is the flowchart of the process implemented by the present invention for creating the effect of a climbing means to adjust the viewpoint. This flowchart defines the process that occurs when the user's viewpoint comes into contact with an object which has the properties of climbability or penetrability stored in the software along with the properties that define that object in 3-D workspace.

As a result, regarding climbability, the viewpoint will automatically be adjusted to simulate the behavior of climbing over the object to reach the desired position. Thus if the user's viewpoint comes into contact with, for example, a staircase object,on a navigation path through 3 dimensional workspace, while attempting to reach a door at the top of a staircase, the viewpoint automatically adjusts to simulate the behavior of climbing the stairs to reach the door viewpoint.

The process is started at FIG. 5, 50 and then the process involves the reading initial stored data for environmental, objects, and viewpoint 51. The process then proceeds to position A, at 52, a key point where information is fed into the display algorithm. This then followed by displaying the view of the environment with objects from prospective of the viewpoint, 53. and the process moves to position B, at 54, an address for input. At this point the process waits for user input 55. Upon receipt of input, the decision point 56 asks if a change in viewpoint is requested. If the answer is no, then the system processes other input and then goes to decision point 58 which asks if this is the end, if yes then the process ends at 60. If the answer is no, then the process returns to position B, at 54 and again awaits input at 55.

If the answer to 56 is yes then the next query is, does the viewpoint collide with an object 61. If no, then the process proceeds to position A at 52. If the answer is yes, then the process 63 checks the collision property of the object collided with. The process then asks whether the 3-D object is penetrable 64. If yes, the object is penetrated and the process proceeds to position A at 52. If the answer to 64 is no then the question is then asked 66, whether the object is climbable 66. If this answer is yes, then the viewpoint is adjusted to climb over the object 67 and then the process goes back to A at 52. If the answer to 66 is no, then the question 69 is raised is there another setting for view point possible. If yes, then the process proceeds to adjust the viewpoint as per other setting 70 and the process proceeds to A at 52.

Although certain preferred embodiments have been shown and described, it will be understood that many changes and modifications may be made therein without departing from the scope and intent of the appended claims.

We claim:

1. In a data processor controlled display system for displaying a virtual three-dimensional workspace having three-dimensional interactive objects within the workspace,

means for displaying a portion of said workspace and the objects therein,

viewer interactive means for navigating along paths in all three dimensions within said workspace to bring selected portions of said workspace into display,

means for storing in association with each of a set of said objects, barrier means for intercepting any of said navigation paths heading toward intersection with any object of said set, and means responsive to said barrier means for diverting said navigation around it's said associated object.

2. In a data processor controlled display system for displaying a virtual three-dimensional workspace having three-dimensional interactive objects within the workspace,

10

means for displaying a portion of said workspace and the objects therein,

viewer interactive means for navigating along paths in all three dimensions within said workspace to bring selected portions of said workspace into display,

means for storing in association with each of a set of said objects, barrier means for intercepting any of said navigation paths heading toward intersection with any object of said set, and

means responsive to said barrier means for diverting said navigation path up and over it's said associated object.

3. The display system of claim 2, wherein the data representing each object and said associated barrier means are stored as a data entity.

4. The display system of claim 3 wherein said data entity is an object-oriented data entity.

5. The display system of claim 2, further allowing said viewer to navigate to any other of said three-dimensional object in said workspace, after the navigational path has climbed up and over said intersecting object.

6. The display system of claim 5 wherein said user can interact with said any of said three dimensional object.

7. A data processor controlled display method for displaying a virtual three-dimensional workspace having three-dimensional interactive objects within the workspace, comprising,

displaying a portion of said workspace and the objects therein,

employing a viewer interactive means for navigating along paths in all three dimensions within said workspace to bring selected portions of said workspace into display,

providing a means for storing in association with each of a set of said objects, barrier means for intercepting any of said navigation paths heading toward intersection with any object of said set, and

using a means responsive to said barrier means for diverting said navigation path around it's said associated object.

8. A data processor controlled display method for displaying a virtual three-dimensional workspace having three-dimensional interactive objects within the workspace, comprising,

displaying a portion of said workspace and the objects therein,

employing a viewer interactive means for navigating along paths in all three dimensions within said workspace to bring selected portions of said workspace into display,

providing a means for storing in association with each of a set of said objects, barrier means for directing any of said navigation paths heading toward intersection with any object of said set, and

using a means responsive to said barrier means for diverting said navigation path up and over it's said associated object.

9. The display method of claim 8, wherein the data representing each object and associated barrier are stored as a data entity.

10. The display method of claim 9 wherein said data entity is an object-oriented data entity.

11. The display method of claim 8, further allowing said viewer to navigate to any other of said three-dimensional object in said workspace, after the navigational path has climbed up and over said intersecting object.

5,883,628

11

12. The display method of claim **11**, wherein said user can interact with said any other of said three dimensional objects.

13. In a computer readable program having data structures included on a computer readable medium which causes the display on a data processor controlled display of a virtual three-dimensional workspace, having three-dimensional interactive objects within the workspace,

  means for displaying a portion of said workspace and the objects therein,

  viewer interactive means for navigating along paths in all three dimensions within said workspace to bring selected portions of said workspace into display,

  means for storing in association with each of a set of said objects, barrier means for intercepting any of said navigation paths heading toward intersection with any object of said set, and

12

  means responsive to said barrier means for diverting said navigation path up and over it's said associated object.

14. The computer readable program of claim **13**, wherein the data representing each object and associated barrier are stored as a data entity.

15. The computer readable program of claim **14** wherein said data entity is an object-oriented data entity.

16. The computer readable program of claim **13**, further allowing said viewer to navigate to any other of said three-dimensional object in said workspace, after the navigational path has climbed up and over said intersecting object.

17. The computer readable program of claim **16**, wherein said user can interact with said any other said three dimensional objects.

*   *   *   *   *

**EXHIBIT  C**



US00RE38865E

(19) **United States**
(12) **Reissued Patent**
Dumarot et al.

(10) Patent Number: **US RE38,865 E**
(45) Date of Reissued Patent: **Nov. 1, 2005**

(54) **SYSTEM AND METHOD FOR OPTIMIZING COMPUTER SOFTWARE AND HARDWARE**

(75) Inventors: **Daniel Peter Dumarot**, Cornwall, NY (US); **David Alan Stevenson**, Poughkeepsie, NY (US); **Nicolas Richard Dono**, Hopewell Jtn., NY (US); **James Randall Moulic**, Poughkeepsie, NY (US); **Clifford Alan Pickover**, Yorktown Hts., NY (US); **Bengt-Olaf Schneider**, Yorktown Hts., NY (US); **Adelbert Smith**, Poughkeepsie, NY (US)

(73) Assignee: **International Business Machines Corporation**, Armonk, NY (US)

(21) Appl. No.: **10/141,383**

(22) Filed: **May 8, 2002**

**Related U.S. Patent Documents**

Reissue of:
(64) Patent No.: **6,059,842**
     Issued: **May 9, 2000**
     Appl. No.: **09/060,028**
     Filed: **Apr. 14, 1998**

(51) Int. Cl.⁷ ................................... G06F 9/45
(52) U.S. Cl. ...................... 717/153; 345/846; 345/961; 345/965; 345/967
(58) Field of Search ................................ 717/121, 122, 717/127, 153; 345/846, 961

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,263,164 A | * | 11/1993 | Kannady et al. | 713/1 |
| 5,428,791 A | * | 6/1995 | Andrew et al. | 717/121 |
| 5,436,748 A | * | 7/1995 | Vinel et al. | 359/125 |
| 5,497,490 A | * | 3/1996 | Harada et al. | 713/100 |
| 5,506,952 A | * | 4/1996 | Choy et al. | 345/763 |
| 5,530,887 A | * | 6/1996 | Harper et al. | 710/104 |
| 5,613,125 A | * | 3/1997 | Nguyen et al. | 713/1 |
| 5,668,992 A | * | 9/1997 | Hammer et al. | 713/1 |
| 5,668,995 A | * | 9/1997 | Bhat | 718/104 |
| 5,713,009 A | * | 1/1998 | DeRosa et al. | 713/2 |
| 5,745,880 A | * | 4/1998 | Strothman | 705/7 |
| 5,784,539 A | * | 7/1998 | Lenz | 706/45 |
| 5,809,282 A | * | 9/1998 | Cooper et al. | 709/226 |
| 5,815,152 A | * | 9/1998 | Collier et al. | 345/839 |
| 5,822,565 A | * | 10/1998 | DeRosa et al. | 703/24 |
| 5,944,819 A | * | 8/1999 | Kumar et al. | 713/1 |
| 5,978,594 A | * | 11/1999 | Bonnell et al. | 710/17 |
| 6,177,860 B1 | * | 1/2001 | Cromer et al. | 340/10.1 |

* cited by examiner

*Primary Examiner*—Antony Nguyen-Ba
(74) *Attorney, Agent, or Firm*—Douglas W. Cameron; Anne Vachon Dougherty

(57) **ABSTRACT**

A method of optimizing the operation of a computer system in running application programs in accordance with system capabilities, user preferences and configuration parameters of the application program. More specifically, with this invention, an optimizing program gathers information on the system capabilities, user preferences and configuration parameters of the application program to maximize the operation of the application program or computer system. Further, user selected rules of operation can be selected by dragging rule icons to target optimizer icon.

**58 Claims, 7 Drawing Sheets**





FIG. 1
PRIOR ART

U.S. Patent

Nov. 1, 2005

Sheet 2 of 7

US RE38,865 E



FIG. 2

U.S. Patent

Nov. 1, 2005

Sheet 3 of 7

US RE38,865 E



FIG.3

U.S. Patent

Nov. 1, 2005

Sheet 4 of 7

US RE38,865 E

| APPLICATION NAME | APPLICATION SETTINGS | SYSTEM SETTINGS | DYNAMIC DATA | SUGGESTIONS |
|---|---|---|---|---|
| NAME 1 | A1, A2, A3, . . . | S1, S2, S3, . . . | M1, M2, M3, . . . | R1, R2, R3, . . . |
| NAME 2 | A1, A2, A3, . . . | S1, S2, S3, . . . | M1, M2, M3, . . . | R1,R2, R3, . . . |

430

430

410   420   440   460   480

**FIG.4**



**FIG.5**



**FIG.6**



**FIG.7**

US RE38,865 E

1

## SYSTEM AND METHOD FOR OPTIMIZING COMPUTER SOFTWARE AND HARDWARE

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

### TECHNICAL FIELD

This invention relates to the optimization of computer software and hardware, and in particular to optimization according to user-specified preferences, databases, and dynamic monitoring of system behavior and performance.

### BACKGROUND OF THE INVENTION

Computer operating systems include a large number of parameters, many of which may be queried, controlled, and changed in order to alter the characteristics of the computer system. Similarly, software applications running on computer systems also often include a large number of parameters, many of which may be controlled and changed to alter the characteristics of the application running on the computer system. As an example, in Microsoft's Windows NT operating system, the resolution and color characteristics of the computer system's display may be changed by selecting the "Control Panel" icon from a "Settings" menu item. When the control panel is displayed, a user is presented with a set of new icons, one of which ("Display Properties") may be selected to bring up another panel containing a set of tabs. The "Settings" tab on the "Display Properties" panel may be selected which allows a user to manually change the number of colors, resolution, video refresh rate, font size, and related graphical characteristics. The user specifies the refresh frequency by selecting from a pull-down menu list of available settings (e.g. 60 Hz, 70 Hz, etc.). The user can specify the screen resolution by selecting a slider icon and moving it right or left to increase or decrease the screen resolution (e.g., from 1024×1280 pixels to 600×800 pixels). Some of these settings may affect the performance of applications running on the system. For example, decreasing the color resolution and screen resolution may increase the speed of some graphics applications.

This example focuses on system settings. When one also considers the numerous application settings and various different hardware configurations available to users, and the interaction of all of these settings and configurations, the control accessing of the plurality of settings and configurations can be cumbersome and often requires detailed knowledge on the part of computer users. The need for a dynamic, semi-automatic, consolidated, and rule-based system that changes such settings and other aspects of the computer system, and makes recommendations, becomes apparent. Although many graphical user interfaces exist to control various aspects of the system (such as the graphical slider which controls screen resolution for Windows platforms) and in applications, the need for improved graphical user interfaces becomes apparent as computer systems become more complex.

With reference now to the figures and in particular to FIG. 1, there is illustrated a computer system in accordance with the method and system of the present invention. Typically the computer system 12 includes a computer 36, a computer display 38, a keyboard 40, and multiple input pointing devices 42. Those skilled in the art will appreciate that input pointing devices may be implemented utilizing a pointing stick 44, a mouse 46, a track ball 48, a pen 50, display screen

2

52 (e.g. a touch display screen 52), or any other device that permits a user to manipulate objects, icons, and other display items in a graphical manner on the computer display 38. Connected to the computer system may also be audio speakers 54 and/or audio input devices 51. (See for example, IBM's Voice Type Dictation system. "Voice Type" is a trademark of the IBM Corporation.) A graphical user interface may be displayed on screen 52 and manipulated using any input pointing device 42. This graphical user interface may include display of an application 60 that displays information pages 62 using any known browser. The information pages may include graphical, audio, or text information 67 presented to the user via the display screen 52, speakers 54, or other output device. The information pages may contain selectable links 66 to other information pages, where such links can be activated by one of the input devices, like mouse 46, to request the associated information pages. This hardware is well known in the art and is also used in conjunction with televisions ("web TV") and multimedia entertainment centers. The system 12 contains one or more memories (See 65 of FIG. 2.) where a remote computer 130, connected to the system 12 through a network 110, can send information. Here the network can be any known (public or privately available) local area network (LAN) or wide area network (WAN), e.g., the Internet. The display may be controlled by a graphics adaptor card such as an Intergraph Intense 3D,

Graphical user interfaces (GUIs) provide ways for users of computers and other devices to effectively communicate with the computer. In GUIs, available applications and data sets are often represented by icons 63 consisting of small graphical representations which can be selected by a user and moved on the screen. The data sets (including pages of information) and applications may reside on the local computer or on a remote computer accessed over a network. The selection of icons often takes the place of typing in a command using a keyboard in order to initiate a program or access a data set. In general, icons are tiny on-screen symbols that simplify access to a program, command, or data file. Icons are often activated or selected by moving a mouse-controlled cursor onto the icon and pressing one or more times on a mouse button.

GUIs include graphical images on computer monitors and often consist of both icons and windows. (GUIs may also reside on the screens of televisions, kiosks, personal digital assistants (PDAs), automatic teller machines (AIMs), and on other devices and appliances such as ovens, cameras, video recorders and instrument consoles.) A computer window is a portion of the graphical image that appears on the monitor and is dedicated to some specific purpose. Windows allow the user to treat the graphical images on the computer monitor like a desktop where various files can remain open simultaneously. The user can control the size, shape, and position of the windows.

Although the use of GUIs with icons usually simplifies a user's interactions with a computer, GUIs are often tedious and frustrating to use. Icons must be maintained in a logical manner. It is difficult to organize windows and icons when many are similarly displayed at the same time on a single device.

In a drag-and-drop GUI, icons are selected 64 and moved 68 (i.e. "dragged") to a target icon 69 to achieve a desired effect. For example, an icon representing a computer file stored on disk may be dragged over an icon containing an image of a printer in order to print the file, or dragged over an icon of a trash can to delete the file. An icon representing a page of information on the World Wide Web may be

US RE38,865 E

3

selected and dragged to a trash can to delete the link to the page of information. The page of information may be on the local machine or on a remote machine. A typical user's screen contains many icons, and only a subset of them will at anyone time be valid, useful targets for a selected icon. For example, it would not be useful to drag the icon representing a data file on top of an icon whose only purpose is to access an unrelated multimedia application.

Icons 63 could include static or animated graphics, text, multimedia presentations, and windows displaying TV broadcasts. Icons 63 could also include three dimensional images, for example, those used in virtual reality applications.

## SUMMARY OF THE INVENTION

An object of this invention is a method and system for increasing the apparent speed of a computer by automatically optimizing software and hardware according to user-specified preferences.

Another object of this invention is to provide a method and system for increasing the apparent speed of a computer using a database.

Yet another object of this invention is to provide a method and system for effectively increasing the apparent speed of a computer based on results obtained by dynamically monitoring system behavior and performance.

This invention permits users to conveniently optimize software running on a computer. The term "optimize" refers to running of a computer system or software more efficiently, for example, by maximizing both the speed with which a software application runs and user satisfaction, and/or minimizing cost or resource use. "Optimization" includes the setting of various parameters in hardware, operating system software, or application software such that the system as a whole runs as efficiently as possible. These parameters might be set to optimize speed, system resource cost, or other variables corresponding to a user's satisfaction.

Accordingly, this invention provides for a method of enhancing, for example, program application performance on a computer system. With this invention configuration information and performance capabilities based on characteristics of the program/system are determined. Then, the configuration information and the performance capabilities are used to optimize configuration parameters of the program applications so as to enhance the performance of the workstation in running the program/system. Further, with this invention user preferences in the operation of the program are selected by, for example, dragging rule icons to a target optimizer icon to provide user selected rules of operation of the application program.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be further understood by reference to the following detailed description when read in conjunction with the accompanying drawings, wherein:

FIG. 1 depicts a pictorial representation of an example computer system that embodies the present invention.

FIG. 2 is a block diagram of the computer system architecture showing an optimization database.

FIG. 3 is a block diagram showing portions of a computer network wherein a local computer and a remote computer are both connected directly to the network.

FIG. 4 are example database records that may be used for optimization.

4

FIG. 5 is a flow chart depicting the steps performed in the optimization.

FIG. 6 is a schematic illustration display with an optimizer and rule icons thereon.

FIG. 7 is a flow chart showing the steps of one preferred method of the present invention pertaining to the use of iconic rules.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

With reference now to FIG. 2, there is illustrated a block diagram of the architecture of the computer system 12 in accordance with the present invention.

The core architecture includes a Central Processing Unit 165, memory controller 162, system memory 65, disk storage 70, disk storage controller 75, and graphics subsystem 166. The computer system 12 can be either a stand alone workstation or a server and a workstation connected to each other via a communications network such as the internet. A portion of the system memory is set aside for an optimizer-database cache 80. Additionally, file space 85 on the disk storage unit 70 may be set aside for the optimizer database 140. Generally speaking, a cache or buffer is a place where data (files, images, and other information) can be stored to avoid having to read the data from a slower device, such as a remote, network-attached computer disk. For instance, a disk cache can store information that can be read without accessing remote disk storage.

With reference now to FIG. 3, there is illustrated a partial portion of a computer network in accordance with the method and system of the present invention. Computer system 12 connects to the network backbone 110 by means of a connecting device 100. Also connected to the network 110 are one or more server computers 130 by means of their own connecting device 100'. Those skilled in the art will appreciate that these connecting devices 100 may take various forms, including modems, token-ring hubs, and other network-enabling devices depending on the capabilities and technology of the connecting devices. The remote computer 130 may include an area of system memory and/or disk storage space dedicated to storing and maintaining a optimization database table 140 (e.g. data file). The optimization database table 140 may reside on the local client or reside on both the client and remote computer. Portions of the optimizer program 136 may reside on the local computer and/or the remote computer. The optimizer program contains or accesses a dynamic monitor 137 of system and application activity. Various user applications 138 run on the remote or local computer. For example, these applications may be office productivity, scientific and engineering, finance, transaction processing, Internet, or any other software a user needs to run. Such applications may be controlled by a configuration file 141 or a central database that controls particular settings of the application that may affect application performance. The optimizer program 136 may contain a graphical user interface 139, used to specify settings or provide information to the user. An operating system 150 runs on the local computer. The operating system, such as Windows NT, primarily provides an interface between the user application and the computer hardware. The operating system also provides services on behalf of the user and applications such as networking, file management, etc.

FIG. 4 includes example records 430 for optimizing system performance. The set of records comprise the database 140. Application settings 420 may consist of a set of

US RE38,865 E

5

control parameters A1, A2, . . . , AN shown in this example in rows 430 and associated with a particular unique identifier 410 for a software application. The software application may be designated in the database 140 as an alphanumeric string 410. By way of example, parameter A1 may control the graphical quality of an engineering application's 3-D graphics. Lower graphical quality often implies faster use of an application. The database 140 contains information usually relating to static qualities of the computer system such as the particular operating system, amount of memory, processor speed, graphics card name, and bios version. These values S1, S2, . . . , SN are static in the sense that they do not usually change during the operation of an application. Dynamic data 460 may contain current or prior reports of system behavior or performance. The dynamic data is generally dynamic information, such as current CPU, memory, and disk use, all of which change as an application performs operations, and reads and writes information to memory and disk. The values M1, M2, M3 . . . for this dynamic data 460 may be obtained by a monitor program 137 which, for example, scans the system for CPU, memory, and disk use at specific increments of time. Suggestions 480 consist of alphanumeric information (R1, R2, R3, . . . ) that may be supplied to the user (e.g., recommendations or warning messages) for particular applications. The optimizer program 136 may scan a row or record 430 of database 400 to optimize a single, particular application, or it might join the results of numerous rows to optimize for a set of concurrently running applications designated by identifiers 410. Note that in FIG. 4, parameters A1, A2, A3 . . . control application settings. Parameters S1, S2, S3 . . . control system settings. Parameters M1, M2, M3 . . . control dynamic settings. Parameters R1, R2, R3 . . . are recommendations.

FIG. 5 comprises a flow chart for an optimization process 300 that the local computer 12 or server 130 uses to optimize software applications 138 and system response or utilization, or to provide recommendations 480. In step 303, the optimizer 136 gathers relevant system information including: operating system 150 version and release data, installed hardware components, hardware configuration, and software configurations. For example, the optimizer determines the size of RAM, BIOS level, installed options etc. This information gathering can be accomplished using standard operating system or other commands. For example, on Microsoft's Windows NT operating system, the "Winmsd/f" calls, the Win32 API, queries to the system registry, and other methods known to those skilled in the art, allow the optimizer to collect such information. In step 305, the optimizer 136 gathers relevant application information, for example, release version, installed options, etc. In step 310, the optimizer 136 reads records 430 from database 140, that control various parameters 420, associated with a particular application name 410. The database 140 may reside on a remote computer or server 130 accessed over a network 110 or on the local computer 12.

In step 320, the optimizer 136 monitors system 12 behavior. For example, the optimizer may query the current CPU use, memory use, or other activity 321 using operating system commands known to those skilled in the art. Also, a monitor program 137 may use such commands to monitor such activity. This monitor program 137 may contain a graphical user interface 139 that displays such activity in graphical form, such as with bar graphs, pie carts, numerical indicators, gauges, etc. This activity 321 may be stored in the form of dynamic values M1, M2, . . . , MN in settings 460 and read by the optimizer program 136. Alternatively, the values corresponding to system activity/use may be directly

6

obtained using operating system commands. One benefit of storing the dynamic data is that the optimizer 136 may compare current to past system activity. In this step 320, the optimizer also may perform performance measurements to "benchmark" the system by running built-in test routines. For example, the optimizer may time the rotation of a 3-D graphical object to assess the speed of the graphics subsystem 166.

In step 325, the optimizer 136 reads user input. For example, the user may enter text or data at the keyboard 40 (or with various input devices 46, 48, 50, or by voice input using audio input device 51) that specifies a level of optimization 326. This level of optimization may control which of the application settings 420 are used to optimize the application in step 330 or optimize the system 12 in step 340. A user wishing to have maximum performance may, for example, sacrifice graphic quality controlled in applications settings 420, that are generally read upon invocation of application 138.

By way of example, the optimizer 136 can adjust the following parameter settings 420, in the Unigraphics control file to adjust performance. (Unigraphics is an graphically-intensive engineering application created by EDS.) The values for each of these settings may be determined in step 325 and stored in record 430.

Low Performance settings
  *Ugraf130.realTimeDynamics: TRUE
  *Ugraf130.suppressAutoRefresh: FALSE
  *Ugraf130.backfaceCulling : FALSE
  *Ugraf130.depthSortedWireframe: TRUE
  *Ugraf130.lineAntialiasing: TRUE
  *Ugraf130.disableTranslucency: FALSE
High Performance settings
  *Ugraf130.realTimeDynamics: FALSE
  *Ugraf130.suppressAutoRefresh: TRUE
  *Ugraf130.backfaceCulling: TRUE
  *Ugraf130.depthSortedWireframe: FALSE
  *Ugraf130.lineAntialiasing: FALSE
  *Ugraf130.disableTranslucency: TRUE

In this example, if a user sets suppressAutoRefresh to TRUE, the application performance can improve by reducing excess redrawing. "Low Performance" is generally correlated with higher graphical quality. The "level" of optimization 326 may correspond to the number of "high performance" settings selected. For example, highest performance (highest level of optimization) may correspond to the use of all the settings in their high performance states. Lower levels of optimization correspond to fewer of the high-performance settings being used. Those values that constitute high performance settings may be stored in application settings 420.

Similarly, the optimizer also optimizes system settings 440. These are settings independent of applications and generally associated with the computer or its hardware or software components. For example, the graphics card may have general settings that control the resolution, color depth, synchronization on vertical refresh, and other features. The disk may have a fragmentation state which may be altered. The size of "swap" spaces may be specified. These system settings are sometimes stored in the system registry or in initialization files which may be modified using methods known to those skilled in the art.

Returning to step 325 in FIG. 5, as an alternative to text, a graphical user interface 139 may be used to provide input

US RE38,865 E

7

data. For example, a graphical depiction of a slider may be used to control the program optimization level by causing the optimizer 136 to optimize 330 the application by writing discrete records in an application configuration file 141 stored on disk. See step 330. Such a file as the configuration file 141 is typically read by an application when the application starts and controls various performance characteristics of a particular application. The audio input device 51 also permits speech input in step 325. Generally speaking, in steps 330 and 340, the optimizer uses the information acquired in steps 303, 305, 310, 320, and 325 to adjust system or application parameters in order to optimize the operation of the application. For example, the ensemble of data from 310, 320, and 325 may cause the optimizer to not only specify settings to the application but also to the graphics card, or system to alter the speed of the application. In general, the optimizer adjusts system and application settings to best meet user-specified quality/performance trade-offs. The information gathered in steps 303, 305, and 320 may be stored in the database 140 maintained by the optimizer. The database can be helpful in determining changes to system and application configurations at different points in time, in evaluating the effects of changing application settings, and in comparing actual system/application settings with recommended settings.

In step 350, the optimizer 136 may provide suggestions or recommendations 480, for example, in the form of specific text that is output to the user. This output may appear in the optimizer's graphical user interface 139, in a web browser 90, or as audible sound played through speakers 54 another audio output device. These recommendations may be used to warn the user of various conditions (e.g. "disk space is low"), or give suggestions on how to improve performance (e.g. "purchase more memory"). The optimizer contains rules 331, 341, 351 that it uses to make such optimizations 330, 340 and recommendations 350. For example, a rule may be: If A1=yes, and S1=200 MHz, or M1=90%, then make suggestion and change (in step 340) the graphic card settings (e.g. 450) that control "synchronization on vertical refresh". In this example, S1 corresponds to the processor frequency, and M1 corresponds to the percentage of memory used. A rule may consist of a set of conditionals and Boolean operations (e.g. if A and B are true and C is false then make suggestions and take action).

Note that the suggestions 480, entire records 430, and rules 331, 341, 351 may be segregated into different files in database 400, stored at a local machine 12 or remote machine 130. Users may view (360) the rules 331, 341, 350, records 430, and suggestions 480 using graphical user interface 53, which may visually segregate these items based on origin of the suggestions (e.g. companies, individuals, etc.), severity, date, or other criteria. These rules and suggestions may be web accessible (using network 110) for dynamic optimization across the web using a propriety program product at the web server.

Referring to FIGS. 1 and 5, note that the rules 331, 341, 351 may also be represented as icons 63 displayed on the graphics screen. (These icons representing rules are hereafter sometimes referred to as "iconic rules".) Particular rules may be selected 64 from a set of available rules by the user and dragged 68 to an icon 69 representing the optimizer 136 so that the optimizer will implement 330, 340, 350 the rules. Additionally, the rules 331, 341, 351 may require password protection so that only certain users or classes of users have permission to implement the rules. In an example scenario, a user drags 68 an iconic rule 63 to optimizer icon 69. This rule may require that the graphical quality be degraded for

8

a model part if the model part consists of greater than 100,000 triangular facets. (This will enhance the display speed of the model part.) When the user drops the iconic rule on the optimizer icon, the user must enter a password (e.g. consisting of a keyboard entry, speech input, mouse swipes, a sequence of mouse key presses, a secret position on the optimizer icon, or by other means) before the rule is acted upon in steps 330, 340, or 350. In another embodiment, the rules are dragged to a region 70 of the screen and not to the optimizer icon in order for the rules to take effect. Password protection may be useful in a variety of situations, for example, if certain rules are being tested by developers and administrators or if certain rules cause actions that should be restricted (e.g. access to confidential databases, CPU or cost-intensive jobs, the allocation of e-money and credit information, etc.)

The optimizer in steps 330, 340 and 350 may learn 370 from a user's past activity. For example, if the user has always used an application with small files, and past CPU use has always been low (e.g. as stored in settings 470), the software optimizer can make suggestions (480), accordingly. Note that one benefit of having portions of the database 140 (e.g. the settings and suggestions) and rules 331, 341, and 351 on a remote machine 130 is that a company or system administrator can continually manage and update messages and rules as new information is provided by application vendors. When a user runs an application in 410, the user can make use of the latest information in the database. If the database 140 resides on a remote machine 130 the optimization 330, 340, and 350 can be performed either on the local machine or the remote machine. If performed on a remote machine, messages and other parameters are fed from the remote server 130 to the client 12 using the network 110.

FIG. 6 is a block diagram of a GUI 591 with rule icons 540,63 (See FIG. 1.) including optimizer icons 69, 510, 511. In the present invention, the user uses a selection device such as mouse 46 to select 512 an icon 540 and drags 550 the icon to optimizer icons 510, 511. If the icon 540, representing a rule, is touching or close (within a threshold distance 590) to the optimizer icon 510, then the rule 541, 331, 341, 351 is applied. In other words, "closeness" of an icon is determined by computing the distances from the selected icon 540 to regions 520 of the optimizer icon displayed on the GUI. If the distance is smaller than a particular threshold 592, the icon 540 is close to a region of the optimizer.

In one embodiment, the optimizer icon 510 consists of different regions 520 to which iconic rules 540 are dragged. The optimizer software determines near what location 520 icon is positioned using techniques which are well known to those skilled in the art of GUI interfaces. In addition to performing general optimization, the optimizer icons 510 may be used to specify the 'nature' of the update; for example, one optimizer icon 510 may be specified for optimization concerning graphics, while another icon 511 may be specific for controlling all aspects of memory and disk space. The optimizer icon may change its graphical attribute such as color or brightness 570 in response to the information gained when the optimizer software applies the rules 541. For example, once a rule is successfully applied, then the optimizer region 520 may turn red 570. The iconic rules 541 may also change graphical attributes in a similar manner. (Changes in graphical characteristics of the iconic rules and optimizer icons are carried out in step 670 in FIG. 7.)

The rule application can be carried out by the optimizer software by comparing the position 585 of icon 540 to values stored in a position file 596 which may be stored on disk.

US RE38,865 E

9

The optimizer icon 510 may also contain graphical indications of regions 520, such as cutouts 530, to which iconic rules 540 may be dragged. In this manner, when the icons are placed in the optimizer icon 510 there can be a graphical indication 551 of the binding to the user. Additionally, the area around the cutout may change color or brightness 570 once an icon 540 is located in the cutout. The use of discrete cutouts 530 may be useful when only a limited number of rules may be used. The rules may be evident to the user by text 560 written on the optimizer icon or by colors 570.

FIG. 7 is a flow chart 600 showing the steps 600 performed for a preferred version of optimizer 163 executed by the system in FIG. 1. In step 610, a program checks if an icon 540 (e.g., if an iconic rule) is selected. The selected icon 540 may be selected by any selection method: e.g., pointing and clicking or by an application program If the icon is moved 620, its new location is determined 630. If the icon is near (within a threshold distance 590 from) an optimizer region 520 (step 640), then a visual indication 650 of placement such as changing color or brightness 570 of a region 520 optionally may be given. As stated in the description of FIG. 5, the region 520 may be graphically depicted as cutouts 530 to help give users a graphical (visual) indication of the placement. Also as mentioned in the description for FIG. 5, "nearness" or "closeness" is determined by computing the distances from the selected icon to all optimizer icons regions 520 on the GUI. In one preferred embodiment, distances are computed using known geometrical methods. For example, if (x1,y1) are the coordinates of an icon 540 and (x2,y2) are the coordinates of a region 520, then the distance is d-sqrt ((x2−x1)**2+(y2−y1)**2). This formula may be extended to include additional variables for higher dimensional spaces, such as in a virtual reality or three-dimensional environment. An optimizer table (file) 596 on disk may store the x,y locations of regions 520.

The rule 541 represented by an icon 540 is applied 660. The icon 540 or optimizer icon 510 optionally may change color, brightness, texture, blink rate, shape, size, or other graphical attribute (see step 670). This graphical attribute may be a function of the nature of the rule. For example, an iconic rule that increases graphics quality may be red. An icon representing a rule that decreases graphics quality may be green. The optimizer icon may change colors when the rule is successfully applied or has a beneficial effect.

Having thus described our invention, what we claim as new and desire to secure by Letters Patent is:

1. In a computer system, a method of enhancing program application [or system] performance of said computer system, said method comprising:
   a. determining configuration information of said computer system;
   b. determining performance capabilities of said computer system based on known characteristics and behaviors of said program application; and
   c. *automatically* optimizing configuration parameters of said program application in response to said configuration information and said performance capabilities.

2. A method as recited in claim 1, further comprising:
   a. determining user preferences for the operation of said computer system and further *automatically* optimizing said computer system in response to said user preferences.

3. A method as recited in claim 1, *wherein said* determining performance capabilities of said computer system comprises:
   a. comparing system performance against previous system performance, where said previous system performance is stored in a database with said configuration parameters.

10

4. A method as recited in claim 2, wherein said user preferences are determined using a graphic user interface through which a user enters said user preferences.

5. A method as recited in claim 1, further comprising:
   a. providing recommended system configurations in response to said performance capabilities that are determined.

6. A method as recited in claim 1, wherein said configuration information comprises at least one of the following:
   a. CPU speed, memory capacity, disk subsystem capabilities, system BIOS version, graphics adapter type, driver levels, operating system software and service pack release levels.

7. A method as recited in claim 1, wherein said performance capabilities comprise at least one of the following:
   a. CPU performance for integer and floating point tasks, memory subsystem throughput, disk subsystem throughput,
   b. 3D graphics performance, and
   c. 2D graphics performance.

8. A method as recited in claim 1, wherein said computer system can operate according to a plurality of rules of operation, wherein said graphic user interface comprises user selectable rule icons, each of which represents one of said rules of operation for said computer system, and wherein a user can select at least one of said rules of operation by selecting at least corresponding one of said rule Icons.

9. A method as recited in claim 8, wherein said user selects one of said rule icons by dragging and dropping said one icon to an optimizer icon, wherein said dropping results in the application of said selected one rule of operation.

10. A method as recited in claim 9, wherein said optimizer icon comprises a plurality of locations, each location capable of accepting one of said rule icons, wherein one of said rules is implemented when a corresponding one of said rule icons representing said one rule is placed on said graphical user interface within a threshold distance of said one location.

11. A method as recited in claim 10, wherein each location is visually distinguished.

12. A method as recited in claim 10, wherein each location is visually distinguished by at least one of the following characteristics: color, outline, textures, and brightness.

13. A method as recited in claim 10, wherein each location is spatially distinguished.

14. A method as recited in claim 10, wherein at least one of said locations is a cutout on said optimizer icon.

15. A method as recited in claim 10, wherein there is a visual indication that one of said rule icons is within said threshold distance.

16. A method as recited in claim 1, further comprising:
   a. storing said known characteristics and behaviors of said program application in a database.

17. A method as recited in claim 16, wherein said database is hard-coded into said program application.

18. A method as recited in claim 16, wherein said database is stored as a table.

19. A method as recited in claim 16, wherein said database is constructed by the user via a graphical user interface that uses a drag-and-drop paradigm to construct rules by combining graphical user interface components representing components of the rule.

20. A method as recited in claim 16, wherein said database is stored in a storage device that is remote from said workstation.

US RE38,865 E

11

21. A method as recited in claim 1, wherein said computer system comprises a server and a remote station which can be interconnected to each other through a communications network.

22. A method as recited in claim 1, further comprising optimizing configuration parameters of said computer system in response to said configuration information and said performance capabilities.

23. A method as recited in claim 1, wherein determining performance capabilities of said computer system comprises:

a. determining real time resource utilization when said program application is being executed.

24. A method of running an application program on a computer system to accomplish a user selected result in the running of the application program, said method comprising:

a. determining the utilization of selected resources of said computer system at selected intervals during the running of the application program;

b. comparing said resource utilization with predefined thresholds; and

c. alerting a user of said computer system to alter application program parameters if said resource utilization comparison satisfies predefined criteria with respect to said thresholds.

25. A method as recited in claim 24, wherein said predefined criteria comprises a combination of resource utilization requirements for a set of said resources of said computer system.

26. A method of enhancing computer systems performance, said method comprising:

a. monitoring user activity;

b. determining user activity patterns;

c. matching said user activity patterns against entries in a database; and

d. *performing at least one of* making suggestions [or] *and* alerting said user to alter at least one of computer system parameters and application program parameters in accordance with said entries.

27. A program storage device readable by machine, tangibly embodying a program of instructions executable by the machine to perform method steps for enhancing program application [or system] performance of a computer system, said method steps comprising:

a. determining configuration information of said computer system;

b. determining performance capabilities of said computer system based on known characteristics and behaviors of said program application; and

c. *automatically* optimizing configuration parameters of said program application in response to said configuration information and said performance capabilities.

28. A program storage device readable by machine, tangibly embodying a program of instructions executable by the machine to perform method steps for running an application program on a computer system to accomplish a user selected result in the running of the application program, said method steps comprising:

a. determining the utilization of selected resources of said computer system at selected intervals during the running of the application program;

b. comparing said resource utilization with predefined thresholds; and

c. alerting a user of said computer system to alter application program parameters if said resource utilization

12

comparison satisfies predefined criteria with respect to said thresholds.

29. A program storage device readable by machine, tangibly embodying a program of instructions executable by the machine to perform method steps for enhancing computer systems performance, said method comprising:

a. monitoring user activity;

b. determining user activity patterns;

c. matching said user activity patterns against entries in a database; and

d. *performing at least one of* making suggestions [or] *and* alerting said user to alter at least one of computer system parameters and application program parameters in accordance with said entries.

30. A system for enhancing program application [or system] performance of a computer system comprising:

a. means for determining configuration information of said computer system;

b. means for ascertaining performance capabilities of said computer system based on known characteristics and behaviors of said program application; and

c. processing means for automatically optimizing configuration parameters of said program application based on said configuration information and said performance capabilities.

31. The system of claim 30 further comprising notifying means for notifying a user of said optimal configuration parameters.

32. The system of claim 30 wherein said automatically optimizing comprises automatically resetting configuration parameters of said program application.

33. *In a computer system, a method of enhancing program application performance of said computer system, said method comprising:*

a. *determining performance capabilities of said computer system based on known characteristics and behaviors of said program application; and*

b. *automatically optimizing configuration parameters of said program application in response to said performance capabilities.*

34. *A method as recited in claim 33, further comprising:*

a. *determining user preferences for the operation of said computer system and further automatically optimizing said configuration parameters of said program application in response to said user preferences.*

35. *A method as recited in claim 33, wherein said determining performance capabilities of said computer system comprises:*

a. *comparing system performance against previous system performance, where said previous system performance is stored in a database with said configuration parameters.*

36. *A method as recited in claim 34, wherein said user preferences are determined using a graphic user interface through which a user enters said user preference.*

37. *A method as recited in claim 33, further comprising:*

a. *providing recommended system configurations in response to said performance capabilities that are determined.*

38. *A method as recited in claim 33, wherein said performance capabilities comprise at least one of the following:*

a. *CPU performance for integer and floating point tasks, memory subsystem throughput, disk subsystem throughput,*

b. *3D graphics performance, and*

c. *2D graphics performance.*

US RE38,865 E

13

39. A method as recited in claim 33, wherein said computer system can operate according to a plurality of rules of operation, wherein said graphic user interface comprises user selectable rule icons, each of which represents one of said rules of operation for said computer system, and wherein a user can select at least one of said rules of operation by selecting at least corresponding one of said rule icons.

40. A method as recited in claim 39, wherein said user selects one of said rule icons by dragging and dropping said one icon to an optimizer icon, wherein said dropping results in the application of said selected one rule of operation.

41. A method as recited in claim 40, wherein said optimizer icon comprises a plurality of locations, each location capable of accepting one of said rule icons, wherein one of said rules is implemented when a corresponding one of said rule icons representing said one rule is placed on said graphical user interface within a threshold distance of said one location.

42. A method as recited in claim 41, wherein each location is visually distinguished.

43. A method as recited in claim 41, wherein each location is visually distinguished by at least one of the following characteristics: color, outline, textures, and brightness.

44. A method as recited in claim 41, wherein each location is spatially distinguished.

45. A method as recited in claim 41, wherein at least one of said locations is a cutout on said optimizer icon.

46. A method as recited in claim 41, wherein there is a visual indication that one of said rule icons is within said threshold distance.

47. A method as recited in claim 33, further comprising:

a. storing said known characteristics and behaviors of said program application in a database.

48. A method as recited in claim 47, wherein said database is hard-coded into said program application.

49. A method as recited in claim 47, wherein said database is stored as a table.

50. A method as recited in claim 47, wherein said database is constructed by the user via a graphical user interface that uses a drag-and-drop paradigm to construct rules by combining graphical user interface components representing components of the rule.

14

51. A method as recited in claim 47, wherein said database is stored in a storage device that is remote from said workstation.

52. A method as recited in claim 33, wherein said computer system comprises a server and a remote station which can be interconnected to each other through a communication network.

53. A method as recited in claim 33, further comprising optimizing configuration parameters of said computer system in response to said performance capabilities.

54. A method as recited in claim 33, wherein determining performance capabilities of said computer system comprises:

a. determining real time resource utilization when said program application is being executed.

55. A program storage device readable by machine, tangibly embodying a program of instructions executable by the machine to perform method steps for enhancing computer application performance of a computer system, said method steps comprising:

a. determining performance capabilities of said computer system based on known characteristics and behaviors of said program application; and

b. automatically optimizing configuration parameters of said program application in response to said performance capabilities.

56. A system for enhancing program application performance of a computer system comprising:

a. means for ascertaining performance capabilities of said computer system based on known characteristics and behaviors of said program application; and

b. means for automatically optimizing configuration parameters of said program application in response to said performance capabilities.

57. The system of claim 56 further comprising notifying means for notifying a user of said optimal configuration parameters.

58. The system of claim 56 wherein said automatically optimizing comprises automatically resetting configuration parameters of said program application.

* * * * *

KARIN G. PAGNANELLI (SBN 174763)
kgp@msk.com
MARC E. MAYER (SBN 190969) mem@msk.com
GILBERT S. LEE (SBN 267247) gsl@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone: (310) 312-2000 Facsimile: (310) 312-3100

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC.<br><br>              v.<br><br>NOVALOGIC, INC. | CASE NUMBER<br><br>**CV13-05091-SS**<br><br><br><br>**SUMMONS** |

PLAINTIFF(S)

DEFENDANT(S)

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Marc Mayer, whose address is Mitchell Silberberg & Knupp LLP, 11377 W. Olympic Boulevard, Los Angeles, CA 90064 (310) 312-2000. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:  JUL 1 6 2013

By: _____

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

---

5432759.1



American LegalNet, Inc.
www.FormsWorkFlow.com

KARIN G. PAGNANELLI (SBN 174763)
kgp@msk.com
MARC E. MAYER (SBN 190969) mem@msk.com
GILBERT S. LEE (SBN 267247) gsl@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone: (310) 312-2000 Facsimile: (310) 312-3100

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION PUBLISHING, INC.<br><br>v.<br><br>NOVALOGIC, INC. | CASE NUMBER<br><br>CV13-05091-SS<br><br>**SUMMONS** |
| PLAINTIFF(S) | |
| DEFENDANT(S) | |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Marc Mayer, whose address is Mitchell Silberberg & Knupp LLP, 11377 W. Olympic Boulevard, Los Angeles, CA 90064 (310) 312-2000. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: JUL 16 2013

By: _____ MARY KONES _____
Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

5432759.1
SUMMONS

American LegalNet, Inc.
www.FormsWorkFlow.com

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )
Activision Publishing, Inc.

**DEFENDANTS** ( Check box if you are representing yourself ☐ )
Novalogic, Inc.

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Karin G. Pagnanelli (SBN 174763)
Marc E. Mayer (SBN 190969)
Gilbert S. Lee (SBN 267247)
Mitchell Silberberg & Knupp LLP
11377 W Olympic Blvd, Los Angeles CA 90064
310-312-2000

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi- District Litigation

---

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☒ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §§ 1331 and 1338(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☒ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY: Case Number:** CV13-05091

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** Marc E. Mayer      DATE: July 16, 2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

American LegalNet, Inc.
www.FormsWorkFlow.com